860 A.2d 986 (2004)
373 N.J. Super. 125
STATE of New Jersey, Plaintiff-Appellant,
v.
Tatiana CHIROKOVSKCIC, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted September 20, 2004.
Decided November 24, 2004.
*987 Edward J. De Fazio, Hudson County Prosecutor, attorney for appellant (Patrick R. Raviola, Assistant Prosecutor, on the brief).
Yvonne Smith Segars, Public Defender, attorney for respondent (Barbara Hedeen, Assistant Deputy Public Defender, of counsel and on the brief).
Before Judges A.A. RODRÍGUEZ, CUFF and HOENS.
The opinion of the court was delivered by
HOENS, J.A.D.
The State of New Jersey, by leave granted, appeals from an order granting defendant Tatiana Chirokovskcic's motion to suppress certain statements made by her while in police custody. We affirm.
The facts surrounding defendant's interrogation are not in dispute. On the morning of September 1, 2001, the body of John Dudowicz was discovered by his sister in the basement of his home in Secaucus. Defendant, who had been the decedent's housekeeper, was in the house at the time that the body was discovered. Hidden near the body the police found a pair of bloodstained rubber gloves.
On the same day, defendant was interviewed by homicide investigators at the Hudson County Prosecutor's Office. She told them that she had been working for the victim, who suffered from cerebral palsy, for approximately four years. Her duties included cooking, cleaning and shopping for him as well as assisting him with personal care activities such as bathing and dressing. She also was required to *988 drive him to places he desired to go. In addition, she had access to his credit cards for her use in buying groceries. Defendant told the investigators that she had been involved in a sexual relationship with the decedent as well, which had begun about six months after she had started working for him. Finally, she told the investigators that she had last seen the victim on August 29, 2001.
During the course of the investigation, the officers learned that the victim had died from multiple blunt force trauma and that there were no signs of forced entry into the home. They also discovered that only the victim, his sister and defendant had keys to the residence. The victim's sister was the executrix of his estate and she soon found that two checks had been written on the victim's account out of sequence and for the benefit of defendant. A handwriting expert examined the two checks and opined that decedent's signature on them had been forged. Further investigation uncovered charges to the victim's credit card that had been made at times when it was believed that the victim had been at work and involved purchases for which he had not signed. In addition, while the investigation was being conducted, defendant was seen driving the victim's automobile. She declared that the vehicle was a gift to her and she registered the vehicle in her own name in Connecticut. In doing so she utilized a document purportedly signed by the decedent but which was dated some six weeks after his body had been found and which the handwriting expert believed was also a forgery.
On October 19, 2001, the Prosecutor's Office received the results of Polymerase Chain Reaction (PCR) testing performed by Cellmark Labs on the rubber gloves. That testing revealed that the blood found on the outside of one of the gloves was that of the victim. It further revealed that there was DNA material inside that glove. Testing of that DNA, while not definitive, demonstrated that the victim, defendant and an unidentified third person could not be ruled out as the source of the DNA. Based on this information, on February 1, 2002, defendant was arrested and charged with murder, N.J.S.A. 2C:11-3a(1), -3a(2); theft by deception, N.J.S.A. 2C:20-4; and uttering a forged instrument, N.J.S.A. 2C:21-1a(3).[1] She was advised of her Miranda[2] rights and she signed a written waiver of those rights when she arrived at the prosecutor's office that day.
In preparation for their interrogation of defendant, the detectives created a fictitious laboratory report. That report included some of the findings contained in the Cellmark Labs report, namely that DNA analysis had identified the blood on the outside of the glove as that of the victim and that DNA from defendant had been found on the inside of the glove. In addition, however, that report falsely purported to have identified the time when the two DNA samples had been deposited on the glove. That false time notation effectively established that both samples were picked up by the glove at approximately 5:00 a.m. on August 30, 2001, and therefore demonstrated that defendant had been at the scene of the murder. Detective Robert Bava, who had created the fictitious report, testified during the hearing *989 on the motion to suppress. He testified that he had created the false report in order "to confront defendant with what would be interpreted by most people as irrefutable scientific proof that established her presence at the scene at the time of the murder."
During the interrogation, which continued for several hours, but which included breaks for a variety of reasons not germane to our analysis, Detective Bava showed the fictitious report to defendant and explained to her what the information in that report meant. Detective Nichelle Luster, who also testified at the suppression hearing, likewise referred to the information in the fictitious report as the questioning continued. Ultimately, although defendant continued to state that she had not murdered the victim and while she was upset that she was being accused of the murder and the theft of the vehicle, she made a variety of incriminating statements. Included among the statements was her admission that she had in fact been in the house on August 30, the date given in the fictitious report, that she had found the victim's body but had not reported it because she feared being blamed for his death and that she had touched the body at that time while wearing the gloves. Later that evening, she gave a recorded statement which included these admissions.
Defendant moved to suppress the statements made in the interview after the time when the fictitious report was shown to defendant as well as defendant's recorded statement in its entirety. The motion judge granted that relief, reasoning that the creation of the fictitious report and its use during the interrogation was a violation of defendant's Fifth Amendment rights. He further reasoned in the alternative that this court's then-recent decision in State v. Patton, 362 N.J.Super. 16, 826 A.2d 783 (App.Div.), certif. denied, 178 N.J. 35, 834 A.2d 408 (2003), which precluded the use of fabricated tangible evidence in police interrogations, was entitled to retroactive application. On appeal, the State argues that the motion judge erred with respect to his analysis of Patton and retroactivity. We disagree.
Initially we note that the retroactivity analysis is only appropriate if the principle to be applied is considered to be a "new rule of law." State v. Cupe, 289 N.J.Super. 1, 12, 672 A.2d 1233 (App.Div.)(citing State v. Burstein, 85 N.J. 394, 403, 427 A.2d 525 (1981)), certif. denied, 144 N.J. 589, 677 A.2d 761 (1996). The reason, of course, is that new rules tend to "`disrupt[ ] a practice long accepted and widely relied upon....'" State v. Lark, 117 N.J. 331, 338, 567 A.2d 197 (1989) (citation omitted), and therefore have the potential to create confusion and disruption if applied retroactively. In order to be deemed a new rule for retroactivity purposes, "there must be a `sudden and generally unanticipated repudiation of a long-standing practice.' "State v. Purnell, 161 N.J. 44, 53, 735 A.2d 513 (1999) (citations omitted).
Once a court has concluded that it is faced with a new rule, three factors must be considered in order to determine whether that rule is to be applied retroactively. In making that determination, the court must analyze "(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice." State v. Knight, 145 N.J. 233, 251, 678 A.2d 642 (1996) (quoting State v. Nash, 64 N.J. 464, 471, 317 A.2d 689 (1974)(other citations omitted)). Notwithstanding this well-established three-part test, a retroactivity *990 determination in general often turns on the "court's view of what is just and consonant with public policy in the particular situation presented." Ibid. (citing Nash, supra, 64 N.J. at 469, 317 A.2d 689).
The threshold question presented on appeal, therefore, is whether Patton established a new rule of law, for if it did not, the motion judge was free to apply its reasoning without undertaking the retroactivity analysis at all. Our consideration of whether Patton established a new rule of law requires that we first set forth the facts and holding of that decision in some detail.
The facts of Patton are these. Acting on an anonymous tip, police stopped, searched, and arrested defendant Ronald Patton in connection with the murder of a woman in an alley in Camden and took him to police headquarters. See Patton, supra, 362 N.J.Super. at 18, 826 A.2d 783. The police did not begin questioning Patton immediately, but held him for nineteen hours while they fabricated an audiotape of an alleged "eyewitness" to the murder being interviewed. Id. at 18-19, 826 A.2d 783. A sergeant from the Camden County Prosecutor's office posed as the "eyewitness." Id. at 19, 826 A.2d 783. To make the tape appear to be authentic, police peppered the interview with specific information about Patton. Id. at 23, 826 A.2d 783. Included on the tape was a statement by the "eyewitness" that on the day of the murder the victim told the "eyewitness" that she had had an argument with Patton. Id. at 21, 826 A.2d 783. The purpose in creating this fabricated audiotape was "[t]o let [defendant] think there was an individual who saw him do what we [thought] he did." Id. at 19, 826 A.2d 783. Immediately after Patton heard the audiotape, he confessed to the murder and agreed to give a taped statement. Id. at 24, 826 A.2d 783. The prosecutor later introduced the fabricated audiotape into evidence at trial, and Patton was convicted of murder. Id. at 18, 826 A.2d 783.
On appeal, this court analyzed the voluntariness of Patton's confession and whether the use of police-fabricated tangible evidence during the interrogation process and at trial violated Patton's rights under the United States or the New Jersey Constitution. Id. at 27, 826 A.2d 783. We first noted that a confession cannot be admitted into evidence absent proof that the suspect's waiver of his privilege against self-incrimination was knowing, intelligent and voluntary. Id. at 42, 826 A.2d 783 (citing State v. Presha, 163 N.J. 304, 313, 748 A.2d 1108 (2000)). We acknowledged that federal and state courts have tolerated the use of trickery and deceit by police during interrogation, allowing police to lie to defendants and to pretend they had incriminating evidence when they did not. See, e.g., Sovalik v. State, 612 P.2d 1003 (Alaska 1980); State v. Cobb, 115 Ariz. 484, 566 P.2d 285 (1977); State v. Jackson, 308 N.C. 549, 304 S.E.2d 134 (1983); State v. Register, 323 S.C. 471, 476 S.E.2d 153 (1996)(allowing police to deceive defendant by saying defendant's tires and shoes matched impressions found at the murder scene and that DNA linked defendant to the crime), cert. denied, 519 U.S. 1129, 117 S.Ct. 988, 136 L.Ed.2d 870 (1997). We also acknowledged that the courts in this State have permitted police to use trickery during interrogations. See, e.g., State v. Cooper, 151 N.J. 326, 355-56, 700 A.2d 306 (1997), cert. denied, 528 U.S. 1084, 120 S.Ct. 809, 145 L.Ed.2d 681 (2000); State v. Manning, 165 N.J.Super. 19, 30-31, 397 A.2d 686 (App.Div.1978)(allowing police to lie to defendant that his co-defendant had already confessed), rev'd on other grounds, 82 N.J. 417, 413 A.2d 605 (1980).
While in Patton we recognized that police may make misrepresentations of *991 fact or suggest that evidence exists that implicates a suspect, we drew a distinction between verbal trickery and the fabrication of false tangible evidence by police to elicit a confession. Patton, supra, 362 N.J.Super. at 32, 826 A.2d 783. In analyzing the issue, we expressed a concern that false documents fabricated by police to induce a confession might later be introduced into evidence, see id. at 33, 826 A.2d 783 (citing State v. Cayward, 552 So.2d 971, 974-75 (Fla.Dist.Ct.App.1989)), a prediction that proved accurate in the Patton trial itself, where the prosecution introduced the fabricated audiotape at trial. Id. at 38, 826 A.2d 783.
Moreover, we considered at length in Patton whether the conduct of police in fabricating tangible evidence violated Patton's constitutional rights to due process. Id. at 41-42, 826 A.2d 783. We noted that in New Jersey, courts test admissibility of confessions not only against the rules of evidence, but also in light of "the deeper constitutional requirement of fundamental fairness." Id. at 42, 826 A.2d 783 (citing State v. Driver, 38 N.J. 255, 282, 183 A.2d 655 (1962)). Finally, the Patton court sought guidance from the "Inbau Manual," see Fred E. Inbau, Criminal Interrogation and Confessions (4th ed.2001), a manual on interrogation techniques that many police departments use and that describes standard interrogation practices. Patton, supra, 362 N.J.Super. at 47, 826 A.2d 783. As we quoted it in Patton, the manual prohibits fabrication of tangible evidence in clear language:
[T]he investigator ... should not prepare false incriminating documents that appear to have been generated through an official source (for example, a crime lab, the FBI). The reason for this is a concern that such falsified documents may find their way into the court system.
[Id. at 48, 826 A.2d 783 (quoting Inbau, supra, at 217 n. 2).]
Balancing all of these concerns, and recognizing that police-fabricated tangible evidence inevitably undercuts our confidence in the voluntariness of a confession, we held in Patton that law enforcement as well as the public would best be served by a "bright-line" rule precluding the use of police-fabricated tangible evidence. Ibid.
While Patton referred to its holding as a "bright-line rule" we do not view that decision as announcing a new rule of law for the purposes of the retroactivity analysis. In order to qualify as a new rule in the sense required by the test for retroactivity, the decision must be one which represents a sudden and unexpected change in what was previously an accepted practice. See Purnell, supra, 161 N.J. at 53, 735 A.2d 513.
Viewed against that standard, the Patton decision does not represent a new rule of law. Simply put, we have never previously condoned police fabrication of tangible evidence nor have we permitted such evidence to be introduced at trial in the past. Nor, for that matter, was there an accepted practice among police investigators or detectives which utilized the fabrication of tangible evidence prior to Patton. As demonstrated by the Patton court's reference to the Inbau manual, standard interrogation techniques did not permit and in fact condemned the practice of fabricating tangible evidence entirely.
Because there was no longstanding or accepted practice permitting such a tactic, the Patton decision was not a sudden or unexpected change in the law. That being the case, the trial court was not required to undertake a retroactivity analysis before applying the logic of that decision here. Our review of the trial court's analysis of the underlying constitutional *992 infirmity in the interrogation that gave rise to this defendant's incriminating statements compels us to reach the same conclusion the trial court reached, namely, that the challenged statements must be suppressed.
Affirmed.
NOTES
[1] After the completion of the investigation, defendant was indicted, Hudson County Indictment No. 1424-06-02, for these charges, along with counts for unlawful possession of a weapon, N.J.S.A. 2C:39-5d; possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4d; unlawful use of a credit card, N.J.S.A. 2C:21-6h; and theft by unlawful taking, N.J.S.A. 2C:20-3.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).