CARAWAY, J.
| Following a jury trial, Surcorey Odums was found guilty as charged of second degree murder, in violation of La. R.S. 14:30.1, and sentenced to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. Odums appeals his conviction and sentence. We affirm.

Facts

On February 11, 2010, James Pouncy was found in his vehicle on a Shreveport residential street with multiple gunshot wounds. Pouncy later died from his wounds. Upon investigation, Shreveport police officers were unable to locate any eyewitnesses to the shooting or identify the shooter from the evidence collected at the crime scene. The case remained unsolved until 2013, when police obtained the murder weapon and a video taken six days after the murder showing Surcorey Odums selling the murder weapon, a gun, to undercover law enforcement officers.
Detectives interviewed Odums, who confessed that he shot Pouncy and sold the murder weapon to the undercover agents. Odums was arrested, and on August 15, 2013, a grand jury indicted Odums for the second degree murder of James Pouncy.
After a jury trial beginning April 22, 2015, Odums was convicted as charged of second degree murder. Odums filed motions for post-verdict judgment of acquittal and new trial asserting that the evidence was insufficient to support the conviction and that a new trial was warranted because of newly-discovered evidence (a fabricated lab report) that was never disclosed to the defense. After a hearing the trial court denied both ^motions. On June 24, 2015, Odums was sentenced to mandatory life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence, concurrent with any other sentence Odums was serving. Odums was ordered to serve 30 days in the parish jail in lieu of court costs, concurrent to the other sentence and with credit for time served. After the trial court denied a timely motion to reconsider sentence, this appeal followed.[1]

Discussion

Sufficiency of the Evidence

In his first assignment of error, Odums argues that the evidence was insufficient to support the verdict of guilty of second degree murder. Odums asserts that the state’s witnesses presented many different and conflicting stories about the events and that there was no substantial evidence linking him to Pouncy’s murder. Odums also claims that his confession to the murder was uncorroborated.
The proper test for determining a claim of insufficiency of evidence in a criminal *853 case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Tate, 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Crossley, 48,149 (La.App. 2 Cir. 6/26/13), 117 So.3d 585, writ denied, 13-1798 (La. 2/14/14), 132 So.3d 410. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La. 2/22/06), 922 So.2d 517; Crossley, supra; State v. Dotie, 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied, 09-0310 (La. 11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App. 2 Cir. 2/25/09), 3 So.3d 685, writ denied, 09-0725 (La. 12/11/09), 23 So.3d 913, cert. denied, 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010); State v. Hill, 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758, writ denied, 07-1209 (La. 12/14/07), 970 So.2d 529.
Direct evidence provides proof of the existence of a fact, for example, a witness’s testimony that he saw or heard something. State v. Lilly, 468 So.2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. The trier of fact is charged with weighing the credibility of this evidence and on review, the same standard as in Jackson v. Virginia, is applied, giving great deference to the fact finder’s conclusions. State v. Hill, 47,568 (La.App. 2 Cir. 9/26/12), 106 So.3d 617.
14When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; Lilly, supra; State v. Robinson, 47,437 (La.App. 2 Cir. 11/14/12), 106 So.3d 1028, writ denied, 12-2658 (La. 5/17/13), 117 So.3d 918.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Glover, 47,311 (La.App. 2 Cir. 10/10/12), 106 So.3d 129, writ denied, 12-2667 (La. 5/24/13), 116 So.3d 659; State v. Speed, 43,786 (La.App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied, 09-0372 (La. 11/6/09), 21 So.3d 299.
The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000); State v. Woodard, 47,286 (La.App. 2 Cir. 10/3/12), 107 So.3d 70, writ denied, 12-2371 (La. 4/26/13), 112 So.3d 837.
*854 Specific intent to kill or inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries. State v. Patterson, 10-415 (La. App. 5th Cir. 1/11/11), 63 So.3d 140, writ denied, 11-0338 (La. 6/17/11), 63 So.3d 1037; State v. Durand, 07-4 (La. App. 5th Cir. 6/26/07), 963 So.2d 1028, writ denied, 07-1545 (La. 1/25/08), 973 So.2d 753. As a state of mind, specific intent need not be proved as a fact; it may be inferred from the circumstances and the actions of the defendant. State v. Kahey, 436 So.2d 475 (La. 1983). The determination of whether the requisite intent is present is a question for the trier of fact. State v. Huizar, 414 So.2d 741 (La. 1982).
Flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. State v. Garner, 45,474 (La.App. 2 Cir. 8/18/10), 47 So.3d 584, writ not considered, 12-0062 (La. 4/20/12), 85 So.3d 1256.
At the trial of this matter, Shreveport Police Officer Vincent Webb testified that at approximately 10:25 p.m. on February 11, 2010, he responded to the call of shots fired at the residential intersection of Wallace and Fuller streets. An older model green Chevy Suburban was stopped at the corner, in the right lane of traffic. Visibility was impaired by snow falling. The officer saw that the driver’s side window was down and a man sitting at the steering wheel was slumped over and unresponsive. Paramedics found the man had a weak pulse and removed him for transport to a nearby hospital. As the man was removed from the vehicle, Officer Webb saw shell casings fall to the ground. Officer Webb observed no broken glass on the ground and all the other windows were up. Webb saw a small amount of blood in the driver’s seat after the man was removed. Officer Webb testified that, based on the type and location of the shell casings, the murder weapon was probably a semi-automatic handgun that^was fired about six to eight inches from the victim. The victim, identified as Pouncy, later died.
Shreveport Police Officer Lacey Durham testified that she was stopped at a red light at the corner of Linwood and 70th Street during her patrol on February 11, 2010. She saw the brake lights on the vehicle in front of her flash a couple times and then the driver sped into the intersection, into oncoming traffic. The car then pulled into a convenience store on the opposite corner. Officer Durham pulled in behind the vehicle as the driver, wearing pants and a long shirt, jumped from the vehicle clutching something to his chest. The officer ordered the driver to stop, but he ran toward the building and then behind a trash dumpster and disappeared. Officer Durham found a hole in the fence behind the dumpster and noticed footprints in the snow on the other side. She notified nearby law enforcement, who responded that they had picked up the trail of footprints. About five minutes later, the man came walking back, now wearing only his pants and a white tank top. The man identified himself as Surcorey Odums, with a mailing address of 1514 Lash Street, Shreveport, Louisiana. Odums said he ran because he thought he had an outstanding warrant, but he came back in as a canine unit chased him. Odums told the officer that he tore his shirt on a fence.
As Officer Durham was arresting Odums, police dispatch announced that a man was found shot nearby at the corner of Wallace and Fuller streets. Officer Durham testified that Odums threw up at that point. The officers working the shooting searched the victim’s vehicle for identification and announced on the radio that they found mail with the address of 1514 Lash 17Street. When Officer Durham asked if Odums had a family member or friend who *855 had been shot, Odums did not answer and threw up again. Odums was later given a summons and released.
Shreveport Police Officer Danny Duddy testified about the investigation of the crime scene and the victim’s 1995 Chevy Suburban. A total of nine .40 caliber shell casings were found inside and on the ground outside the vehicle. Six .40 caliber bullet projectiles and fragments were retrieved from the interior of the vehicle, along with a small bag of a green leafy substance believed to be marijuana, and a cell phone. Despite the multiple gunshots, only a small drop of blood was found on the driver’s seat; the officer concluded that the victim’s clothing absorbed any blood splatter. After examination of the vehicle and its contents for fingerprints, the only viable fingerprint found was on a bottle and it matched the victim’s girlfriend, Me’shay Carr.
No firearms damage was observed on the vehicle. Using dowel rods, officers marked the trajectory of the gunshots and observed that the shooter was standing at the driver’s side window, firing inward. Officer Duddy testified that, based on the type and location of the shell casings and the lack of firearms damage to the driver’s side, he believed that the murder weapon was an automatic or semi-automatic gun that was inside the vehicle when fired.
Evidence collected from the vehicle, plus swabs of the vehicle for contact DNA testing, were sent to the North Louisiana Crime Lab for testing. Audra Williams, an expert in forensic DNA analysis, testified that DNA tests of the evidence and swabs from the victim’s vehicle did not yield 1 sany results linking a specific individual to the murder. Since no murder weapon was found, information on the spent shell casings was entered into a federal gun database.[2]
James Cromer, Jr., a former Shreveport police officer, testified that he briefly investigated the Pouncy homicide and that a canvass of the neighborhood for eyewitnesses was unsuccessful. A man named A.C. Green told officers that he spoke with Pouncy that night and that Pouncy mentioned that he had been threatened. Poun-cj^s family members told the officers that the victim had gotten back into drugs and could often be found at a house on Nicholson Street, which was just blocks from where the victim was found shot.
Odums became a person of interest in the investigation when officers learned about Officer Durham’s traffic stop and Odums’ flight. Odums voluntarily gave a statement to police on February 13, 2010, telling officers that he had known Pouncy for about five years, had worked with Pouncy before, and had last seen Pouncy two months before. Odums told the officers there were no problems between him and Pouncy and that he was aware that Pouncy was using drugs.
Odums’ statement was contradicted by statements obtained from Katrina Ford, Monique Williams, and Otha Green, who told officers they saw Odums arguing with Pouncy just hours before the murder, at a house on Nicholson Street. The women told officers that they had been gathered there along with the victim, the homeowner, Edwin Harper, and several others, 13drinking, smoking, and gambling. Odums arrived in a white, four-door vehicle and demanded that Pouncy pay him for a debt. *856 Pouncy was angry about the confrontation and refused to pay Odums at that time, saying he would pay him later after a job was completed. Odums told Pouncy “I will kill you,” and then drove Otha Green to Green’s house. On the way back to the Nicholson house, Otha heard Odums on his cell phone asking someone to meet him and bring a gun. Upon returning to the Nicholson house, Otha Green told Pouncy to be careful because Odums was angry and had a gun.
Edwin Harper and another party guest, Ricky Mason, told officers that they did not hear any argument. Katrina Ford told officers that Pouncy and Odums had a prior physical confrontation and Odums said he would not fight Pouncy.
Monique Williams testified that Odums was angry that Pouncy refused to pay him at that time. Williams thought they were friends, so she did not take Odums’ threat that he would kill Pouncy seriously until Green returned and said that Odums was outside and had a gun. Williams said that despite Otha Green’s warning, Pouncy left about 30 minutes later to pick up some beer at a store a few blocks away. He never returned, and Williams learned the next day that Pouncy had been killed.
Otha Green testified that Pouncy clearly did not like the way Odums came into the house demanding his money in front of everyone or the way Odums spoke to Pouncy. Green offered money to Pouncy, but Pouncy pulled a wad of money from his pocket and said he had the money, but he was angry about being disrespected and confronted in front of everyone. Green testified that as he and Odums were returning to the Nicholson house |1flin Odums’ car, he heard Odums ask someone to meet him and to bring a gun. Green testified that he told Odums that the debt was not worth shooting someone. Green went back inside the house while Odums stayed in the car and honked the horn. Green testified that he told Pouncy that Odums was going to shoot him, so do not go outside, but Pouncy did not take the warning seriously. Green asked Pouncy if he had his gun with him, and Pouncy told Green “no.” Green testified that he had never seen Odums before that night. He said a year after the murder, officers presented him with a photographic lineup and he identified Odums as the man who argued with Pouncy that night, gave Green a ride, and asked someone to meet him and bring a gun.
Detectives investigated multiple crime stopper tips and information obtained by other officers about who was involved in the homicide, but found no evidence to confirm any of the rumors.[3] Odums spoke with officers a second time and denied any involvement in the homicide. Odums voluntarily allowed officers to take a saliva swab for DNA testing, but tests did not link his DNA to any evidence at the crime scene.
The case remained unsolved until April 2013, when Shreveport police were notified that the federal gun database had found the gun that was used in Pouncy’s murder. The case was re-assigned to Detective David Bonillas, Inwho obtained the gun and the video that showed Odums selling *857 the murder weapon to undercover agents.[4]
Shreveport Police Officer Jerry Alkire testified that in February 2010 he was part of a joint task force operation in which undercover officers operated a fake storefront selling tobacco products while at the same time buying guns. On February 17, 2010, six days after Pouncy’s murder, one of the regular customers came into the store to sell a gun. Audio and video recordings captured the transaction as the man, known to the officers as Corey, handed the undercover officers the gun and was paid $300. After Corey left, officers noted the gun was a Ruger semi-automatic .40 caliber handgun, model P94, with serial number 341-42502. When the operation was ended several months later, all the guns were collected and fired, and a spent shell casing was sent to a federal gun identification system. The gun database matched the spent shell casing from the gun Corey sold the officers to the spent shell casings found at the Pouncy murder scene.
In a photographic lineup, Officer Alkire identified Odums as the man he knew as Corey, who sold the gun in 2010. Richard Beighley, an expert in firearms identification, testified that he test-fired the gun that had been sold to the undercover agents and confirmed that it was the weapon that was used to fire all nine of the shell casings found inside and near Poun-cy’s vehicle, as well as six of the bullet projectiles found inside the vehicle.
Detective Bonillas testified that he recognized the man in the gun transaction video as Odums, a person of interest in the Pouncy murder and |iathat Officer Alkire identified Odums as the man named “Corey” who sold him the gun. When Beigh-ley’s tests confirmed that the gun Odums sold to the undercover officers was the gun used to kill Pouncy, Detective Bonillas obtained an arrest warrant for Odums. Detective Bonillas made photographic stills from the video of the gun sale, and took the photos and the arrest warrant with him and Detective Curtis to get a statement from Odums.
On June 25, 2013, Detectives Bonillas and Curtis met with Odums to discuss the “suspects” buying and selling guns. They read Odums his rights and he signed the rights form. When officers showed Odums the photographs, he initially denied selling the gun. Detective Bonillas testified that he told Odums that they had audio and video of the gun sale, that tests had proved the same gun was used to kill Pouncy, and that there were witnesses who heard him arguing with Pouncy and threatening to kill him, then asking for a gun. Detective Bonillas then showed Odums the warrant to arrest Odums for second degree murder.
The audiotape of the interview was played for the jury and Odums is heard confessing that he argued with Pouncy, that he shot Pouncy, and that he later sold the gun to the undercover officers. Odums told the officers that he and Pouncy accidentally met up at the intersection and that Pouncy cut him off. He got out of his vehicle and thought that Pouncy was reaching under the seat and was about to exit his vehicle, so Odums shot him. Detective Bonillas testified that Odums never told the officers that he actually saw Poun-cy with a gun and that no gun was found in the vehicle or on the victim. Pouncy was found with approximately $130 in his wallet. | i3Odums told the officers that he was fleeing the murder scene when he was stopped by Officer Durham, and that he ran and hid the gun in an abandoned house so he could retrieve it later.
*858 The defense began its case-in-chief by calling Katrina Ford to testify. Ford confirmed that she was at Edwin Harper’s house the night of February 10, 2010, with Monique Williams and the victim. Ford testified that Odums came to the house to sell her some drugs and that he argued with Monique. At that point Pouncy stood up and he and Odums began arguing about Pouncy’s debt to Odums. Ford never heard Odums tell Pouncy he would kill him, but Harper came in and told them to leave. After Odums left, the group continued getting high and then Pouncy left.
When viewed in the light most favorable to the state, the evidence is sufficient to convict Odums of second degree murder. Williams, Ford and Green all testified that they observed the argument between Odums and Pouncy that evening over Odums not being paid. Williams and Green heard Odum say he would kill Pouncy, a statement that was taken more seriously when Green heard Odums asking for a gun. Within hours of that threat, Pouncy was found dead, shot at close range with multiple gunshot wounds, and Odums was seen by law enforcement fleeing from the area. Six days later, Odums was videotaped selling the gun used to kill Pouncy. Odums confessed that he argued with and shot Pouncy and later sold the gun to the undercover officers. From this evidence, the jury could have reasonably concluded that the corroborated circumstantial evidence and Odums’ confession were sufficient proof of the elements of second degree murder beyond a reasonable doubt. This assignment of error is without merit.
| uMotion to Suppress
In his second assignment of error, Odums argues that the trial court erred in failing to order his June 25, 2013 statements suppressed.
Although the trial began on April 22, 2015, the defense did not file a motion to suppress Odums’ statement and confession to police until April 29, 2015. On April 30, 2015, the court held a “free and voluntary” hearing to determine whether defendant’s June 25, 2013 statements to police during a custodial interrogation were admissible.
At the hearing, Detective Bonillas confirmed that after he was assigned to this cold case on April 23, 2013, he and Detective Curtis met with Odums and told him they were investigating subjects who had been traveling from state to state, buying and reselling guns.[5] Odums told the officers that he knew about the guys buying and selling guns but had no further information for them. The detectives asked if Odums would speak with them about it anyway and advised him that they had to read him his rights in order to ask him any questions. Odums was given a form that listed his Miranda rights and Odums requested that Detective Bonillas read them aloud.
The audio recording of the interview confirms Odums cannot read and asked Detective Bonillas to read each right to Odums. Detective Bonillas read each right to Odums and informed him of his right to waive those rights by giving a statement. Odums was then asked to sign the rights form. Odums asked Detective Bonillas a series of questions before signing the form and continued to speak with the officers, subsequently choosing to |1fianswer their questions. The form, admitted as S-l at the free and voluntary hearing, lists the defendant’s rights and is signed by Odums and the detectives.[6]
*859 Detective Bonillas testified that Odums did not show any signs of being impaired or intoxicated, and that Odums appeared to understand their questions and gave coherent answers. Detective Bonillas testified consistently with his trial testimony regarding Odums’ confession. Detective Bonillas testified that no threats or promises were made to induce Odums to make a statement and that Odums never asked for an attorney and never asked to stop the interview.
Odums testified at the hearing and confirmed that Detective Bonillas read his rights to him, that he understood the rights and signed the Miranda form. Odums testified that he had an eighth-grade education and that he could write a little, but that he could not read. Odums testified that he meant no, when he answered “naw,” to the officer’s request for a statement.[7] Odums also testified that the officers did not touch him, but that he still felt threatened by them because they sat close to him and he felt that they were agitated.
The trial court found that the defendant’s statement to police was freely and voluntarily given, and that the statement was admissible at trial.
On appeal, Odums argues that his confession was inadmissible because he was not properly advised of and did not knowingly, intelligently waive his rights. Odums acknowledges that the officers advised Odums of | ir,his rights by reading them aloud to Odums, but asserts that the detectives failed to make certain that Odums understood that he could have an attorney present for the interview conducted on June 25, 2015. Furthermore, even though Odums said he understood those rights and signed the form, he argues that he did not knowingly, intelligently, or voluntarily waive his rights because he could not read.
La. C. Cr. P. art. 703(D) provides that in a motion to suppress evidence the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant. Great weight is placed upon the trial court’s ruling on a motion to suppress in regard to the finding of facts because it had the opportunity to observe the witnesses and weigh the credibility of their testimony. State v. Thibodeaux, 98-1673 (La. 9/8/99), 750 So.2d 916, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000); State v. Howard, 49,965 (La.App. 2 Cir. 6/24/15), 169 So.3d 777. Accordingly, this Court reviews the trial court’s ruling on a motion to suppress under the manifest error standard in regard to factual determinations, while applying a de novo review to its findings of law. State v. Holder, 50,171 (La.App. 2 Cir. 12/9/15), 181 So.3d 918; State v. Hemphill, 41,526 (La.App. 2 Cir. 11/17/06), 942 So.2d 1263, 1271, writ denied, 06-2976 (La. 3/9/07), 949 So.2d 441.
Before what purports to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, 1 ^inducements or promises. La. R.S. 15:451. The state must establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda[8] rights and *860 that the confession was freely and voluntarily made. State v. Glenn, 49,705 (La.App. 2 Cir. 2/26/15), 162 So.3d 525; State v. Coleman, 48,168 (La.App. 2 Cir. 7/17/13), 121 So.3d 703, writ denied, 13-1990 (La. 5/2/14), 138 So.3d 1237; State v. Fisher, 46,997 (La.App. 2 Cir. 2/29/12), 87 So.3d 189. Miranda warnings must inform the person in custody that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. State v. Leger, 05-0011 (La. 7/10/06), 936 So.2d 108, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007).
Voluntariness is determined on a case-by-case basis, under a totality of the circumstances standard. State v. Parker, 48,339 (La.App. 2 Cir. 10/9/13), 124 So.3d 516.
Whether the police have scrupulously honored a defendant’s right to cut off questioning is a determination made on a case-by-case basis under the totality of the circumstances. State v. Prosper, 08-839 (La. 5/14/08), 982 So.2d 764; Leger, supra. The Louisiana Supreme Court has held that the defendant’s use of the phrase “uh, uh,” could not plausibly be understood as an invocation, ambiguous or otherwise, to cut off questioning in all respects, considering that defendant was willing to talk to authorities even after the 11srespouse as indicated by his continuing to respond to questions. State v. Robertson, 97-0177 (La. 3/4/98), 712 So.2d 8.
An accused must unambiguously request counsel “sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney” in order to cease custodial interrogation. Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), affirmed after writ grant, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); Leger, supra.
The audio recording of the interview corroborates Detective Bonillas’ testimony that he properly advised Odums of his rights by reading him the Miranda rights form and informing Odums of his right to waive his rights by giving a statement. Detective Bonillas read the rights to Odums who indicated that he could not read. Included in those rights was a clear statement regarding Odums’ right to counsel. Further, Detective Bonillas testified that Odums appeared to understand the rights. Odums confirmed that he did understand the rights that Detective Bonillas read to him and confirmed that he signed the Miranda form.
The audio recording also confirms Detective Bonillas’ testimony that Odums never requested an attorney or asked to terminate the interview, and that Odums chose to answer their questions, despite his initial hesitation regarding what the officers were “trying to get me to like testify on.” These statements also show Odums’ awareness of the consequences of his making a statement.
| lflWe find that the state met its burden of proving that Odums was advised of and knowingly waived his Miranda rights,[9] and that the confession was freely and voluntarily made. No evidence shows that Odums requested an attorney. Further, *861 Odums’ understanding of his rights and the waiver thereof is evident on the record. Because Odums has failed to show any abuse of discretion by the trial court in denying the motion, this assignment is without merit.

Motion for New Trial

As noted above, the defense also filed a motion for new trial because of newly discovered evidence of a fabricated lab report that was never disclosed to the defense. The fabricated report was made to appear to be a DNA analysis by the North Louisiana Crime Lab.
At the hearing, the state argued that the fabricated report did not have to be disclosed because it was never used, it was not evidence, and that the officer who fabricated the report never testified at trial. The state also asserted that the jurors heard expert testimony that none of Odums’ DNA was found on anything at the crime scene. Thus, Odoms was not prejudiced by a false document that was merely intended to be an interrogation prop that was never used.
Jimmy Barnhill, system director for the North Louisiana Crime Lab, testified that the lab received the report from one of the prosecutors just prior to trial. Barnhill said that the fabricated report was not evidence, so it wasj^never checked in as evidence. Barnhill noted that while the report was a good fabrication, it was clearly a false DNA report as it was “signed” by the firearms analyst and not a DNA analyst.
The trial court found that the document was not relevant because it was not a crime lab report or evidence of the crime and was never used at trial and denied Odums’ request for a new trial.
On appeal, Odums argues that regardless of whether the report was used in interrogation or presented at trial, the state was obligated to disclose the report as part of discovery and that the failure to do so deprived the defendant of the opportunity to call the officer who created it to testify and impeach his testimony.
In relevant part, La. C. Cr. P. art. 851 provides the grounds allowed for a new trial:
A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
[[Image here]]
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty. * * *
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
[2iA defendant seeking a new trial based on newly discovered evidence bears the burden to prove that (1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of the trial was not caused by lack of diligence; (3) the evidence is material to the issues at trial; and, (4) the evidence is of such a nature that it would probably have produced a different verdict. La. C. Or. P. art. 851(B)(3); State v. Bell, 09-0199 (La. 11/30/10), 53 So.3d 437, cert. denied, 564 U.S. 1025, 131 S.Ct. 3035, 180 L.Ed.2d 856 (2011); State v. Lloyd, 48,914 (La.App. 2 Cir. 1/14/15), 161 So.3d 879, writ denied, *862 15-0307 (La. 11/30/15), 184 So.3d 33, cert. denied, 2016 WL 4083852. The decision of whether to grant or deny a motion for new trial is within the trial judge’s sound discretion. State v. Brisban, 00-3437 (La. 2/26/02), 809 So.2d 923.
In this case, it is undisputed that the defense did not discover the fabricated DNA lab report until after trial. Moreover, the prosecution stipulated that the fabricated lab report was not disclosed. However, because the fabricated lab report was not used during Odums’ interrogation, it has not been shown to be material to Odums’ confession. Likewise, the report was not used at trial.[10] Rather, the jury received expert DNA testimony that none of Odums’ DNA was found at the crime scene. Ultimately, none of the evidence linking Odums to the murder was DNA evidence. Thus, Odums has failed to demonstrate that the jury’s verdict was influenced by the | ¡^fabricated report or that the introduction of the fabricated lab report at trial would have produced a different result. The independent evidence of Odums’ guilt was sufficient on its own to convict Odums of Pouncy’s murder. Thus, Odums has failed to show an abuse of discretion in the trial court’s denial of the motion for new trial.

Conclusion

For the foregoing reasons, Odums’ conviction and sentence are affirmed.
AFFIRMED.

. The motions for new trial, post-verdict judgment of acquittal, reconsideration of sentence and appeal, incorrectly state that Odums was convicted of first degree murder.

. Dr. Long Jin, a forensic pathologist, performed Pouncy's autopsy on February 12, 2010. Dr. Jin testified that Pouncy's cause of death was multiple gunshot wounds to the torso and that the manner of death was homicide. Dr. Jin testified that gunshot wounds to Pouncy’s left chest and lower left abdomen were fatal shots. The damage to Pouncy's organs caused his lungs and abdomen to fill with blood.

. Police also interviewed a man named Julius Atkins, aka "Picklehead,” who was rumored to know who the shooter was. Atkins’ girlfriend, Heather Malone, called 911 and said she heard gunfire and then found the victim in his vehicle. Atkins told officers that he had been walking down Wallace Street that night when he saw two vehicles pulled up next to each other on the street. He saw headlights and then heard gunshots and ducked and ran. He called Malone to contact police. Malone told officers that she heard gunfire but did not see the shooting.

. State’s Exhibit No. 46 contains two DVDs, with video of the gun transaction.

. Odums was incarcerated on pending charges unrelated to this matter.

. Notably, the Miranda form introduced by the state shows that Odums was being investigated for murder.

. The audio recording indicates that Odums answered "Naw” when asked if he could read.

. These rights were set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Likewise, the audio recording also establishes that there were no indications that Odums spoke under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. Odums testified at the free and voluntary hearing that the officers sat close to him and appeared agitated, but the audio recording does not reflect any aggression, threats, or raised voices from the detectives, or fear from the defendant.

. We note that other jurisdictions have held that the use of false information by police during an interrogation is deceptive and a relevant factor indicating a possibility that the defendant’s statements were made involuntarily, Com. v. Monroe, 472 Mass. 461, 35 N.E.3d 677 (2015); Commonwealth v. Selby, 420 Mass. 656, 651 N.E.2d 843 (1995). See also, State v. Chirokovskcic, 373 N.J.Super. 125, 860 A.2d 986, (App. Div. 2004), affirming a "bright-line” rule precluding the use of police-fabricated tangible evidence and Gray v. Commonwealth, 480 S.W.3d 253 (Ky. 2016), which found due process of law violated in obtaining the defendant’s confession by fabricated DNA evidence.