Judgment rendered January 13, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 992,
La. C. Cr. P.

No. 53,662-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                    Appellee

versus

PATRICK NEWTON HARRIS                 Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 217746

Honorable Allen Parker Self, Jr., Judge

* * * * *

STROUD, CARMOUCHE, BUCKLE, PLLC       Counsel for Appellant
By: Ansel Martin Stroud, III

THE BAEZ LAW FIRM, P.A.
By: Jose Angel Baez

PATRICK NEWTON HARRIS                  Pro Se

JOHN SCHUYLER MARVIN                   Counsel for Appellee
District Attorney

JOHN MICHAEL LAWRENCE
ANDREW C. JACOBS
RICHARD RUSSELL RAY
Assistant District Attorneys

* * * * *

Before STEPHENS, BLEICH (*Pro Tempore*), and BODDIE
(*Pro Tempore),* JJ.

BLEICH, J. *(Pro Tempore),* concurring with written reasons.

**Boddie** *(Pro Tempore)*, **J.**

Patrick Newton Harris ("Patrick") was convicted at a bench trial of manslaughter and sentenced to 39 years at hard labor for the 2016 shooting death of William Christopher Flowers ("Flowers"), who was his friend and co-worker. Patrick claimed self-defense, asserting that he had been in fear for his life after Flowers suddenly attacked him. Patrick had suffered violence twice at the hands of Flowers a couple of years earlier, which was around the time when Flowers had engaged in an affair with Patrick's wife, Aftan Harris ("Aftan").

Patrick has appealed his sentence and conviction. After reviewing the record, the briefs, and the argument of the parties, we conclude the evidence was insufficient for a rational trier of fact to have found beyond a reasonable doubt that the homicide was not committed by Patrick in self-defense, and therefore, reverse his conviction.

## BACKGROUND

Patrick, a facility technician, and Flowers, a service technician, were co-workers at AT&T for 15 years. They reported for work at the same Shreveport location, and from there were dispatched to their individual job assignments. The technicians usually worked alone unless they needed help with a work assignment. Patrick would often depend on Flowers for help.

Patrick and Flowers started socializing outside of work during the summer of 2013. Their friendship developed quickly, and Patrick considered Flowers to be like a brother. They were together almost daily, and would often grill food and watch football games together.

In October of 2013, Aftan and Flowers commenced an extramarital affair. Flowers was separated from his wife at the time. The affair continued until it came to light in February of 2014.

On December 31, 2013, Patrick and Aftan attended a New Year's Eve party at the home of Sarah and Stephen McCann. Patrick asked Stephen if Flowers could attend the party so he would not be alone on the holiday. Stephen, who had met Flowers a few months earlier at a cookout, said it was okay.

At some point during the evening, the partygoers decided to "play wrestle" on the trampoline. Patrick measured 6'3" in height and weighed approximately 230 pounds. Flowers was similar in size. During their match, Patrick landed face down on the trampoline mat. Flowers gained the upper hand by getting on Patrick's back and then placing Patrick in a stranglehold by wrapping his arm around Patrick's neck from behind. Patrick tapped on the mat to no avail in an attempt to get Flowers' attention that he wanted to be released. It took McCann getting on the trampoline and pulling Flowers off Patrick for him to be freed.

On February 15, 2014, Patrick and Flowers met at a Chili's restaurant in Shreveport to discuss matters and how they were going to go forward at work in light of the affair. They consumed mixed drinks at the restaurant, and the conversation became heated as the affair was discussed. They were asked to leave the restaurant when their voices grew louder and Patrick became angry. As he exited the restaurant, Patrick decided that he needed his phone from his truck in order to ask Aftan for a ride home. Flowers and Patrick continued to have some words about the affair while they were

outside.  According to Patrick, Flowers threw him to the ground when he declined Flowers' offer of a ride.

A 911 call requesting medical assistance was made.  The caller, who identified himself as "Chris," told the 911 operator that he had "assaulted" Patrick.[1]  Patrick sustained a broken elbow during the incident.  Flowers was not arrested for his role in the injury.

Patrick claimed that he blacked out and that paramedics were standing over him when he awoke.  However, the Shreveport Fire Department report from the incident stated that personnel went to the scene to find Patrick standing.  Patrick was taken by ambulance to a hospital.  The medical records from the hospital reflect that Patrick did not complain of a loss of consciousness.

According to those medical records, Patrick told hospital personnel that he had 12 cans of beer before going to Chili's, and, acting out of character, had a physical altercation with Flowers.  He landed on his right elbow when he was pushed to the ground.  Nursing notes showed that Patrick was having suicidal thoughts.  The medical records also reflect that Patrick was removed from the Emergency Room and transported to the Intensive Care Unit under Physician Emergency Certificate ("PEC") status because of violent behavior and alcohol abuse.

In the findings of examination for the PEC, Dr. Giddens wrote, "ETOH, violent homicidal behavior threatening behavior to wife[.]"  Boxes for "Homicidal?" and "Violent?" were checked for Patrick's condition.  A box for "Suicidal?" was not checked.  Patrick's ethyl alcohol level on

---

[1] Flowers was referred to as "Chris" throughout the trial.

admission was .263. He reported that he drank six cans of beer per day or higher.

Patrick was discharged to a rehabilitation hospital on February 16. His injured arm was placed in a sling and he was instructed to follow up with his orthopedic doctor. The final diagnoses upon discharge were alcohol abuse, violent behavior, right elbow fracture, severe anxiety, and hypertension.

The elbow fracture ultimately required the surgical placement of two plates, numerous screws, and a prosthetic radial head to repair the damage. The plates were removed, but the radial head remained in his arm. Patrick underwent a total of two surgeries and rehabilitation. He also had to wear a device on his right arm for several months to help him regain motion in that arm. He was on disability from work for approximately six months, and returned to work in 2014. After Patrick requested a job transfer, AT&T permitted him to report to a location in Bossier City for approximately eight weeks before returning to his normal location in Shreveport.

Everything remained uneventful between Patrick and Flowers for the next two years. Patrick had taken some firearms to a pawn shop to secure a loan because his income was reduced while he was on short-term disability. When Flowers found out, he paid approximately $3,000 to the pawn shop to have the firearms returned to Patrick. He told Patrick to repay him at his leisure.

On March 24, 2016, Patrick was on short-term disability because of surgery to repair a condition on both of his eyelids. That afternoon, Patrick met Aftan and some of her co-workers at a restaurant. He consumed a

4

margarita, two beers, and two shots while there. On the way home, Patrick stopped at a bank.

Patrick went to Flowers' apartment early that evening to repay part of the loan. Patrick would testify at trial that while he was there, he showed a Taurus .38 revolver ("revolver") to Flowers since they shared a common interest in firearms. Patrick, who had a valid concealed carry permit, returned the revolver to his pants pocket when Flowers had finished looking at it.

Patrick asked Flowers if he knew where to find marijuana. Flowers then contacted a co-worker, James Young, about obtaining marijuana. Patrick left Flowers' apartment since the marijuana was not available at that time. He stopped at a restaurant to get dinner for his family before returning home.

When Young was ready for them to come over, he contacted Flowers, who then drove to Patrick's home. He arrived there around 9:00 p.m. Flowers and Patrick stopped at a convenience store on the way to Young's home. While Patrick was inside, Flowers entered the store to tell Patrick that he (Patrick) was getting text messages from Aftan.

Flowers and Patrick stayed at Young's home for less than an hour. While there, they had a beer and played with Young's dogs. They did not smoke any marijuana. Young did not notice anything unusual or any tension between Flowers and Patrick. They hugged Young before leaving.

While Flowers and Patrick were returning from their marijuana excursion, Daniel Lenard arrived at the Harrises' subdivision to meet one of their neighbors, Aaron Daniel. Daniel had instructed Lenard to stop near the corner of his street and then let him know he was there. When Lenard's

vehicle came to a stop near the Harrises' driveway, Aftan asked him what he was doing. While he was explaining, Flowers' Corvette pulled in front of him. Flowers exited the Corvette without turning off the engine, stood in front of Lenard's car, and placed his hands on the hood. These actions signaled to Lenard not to go anywhere. Patrick approached the passenger-side window of Lenard's vehicle and asked Lenard what he was doing there. Patrick told Lenard that what he was doing was "a good way to get shot." Patrick never showed the revolver to Lenard or threatened him with it.

Daniel soon arrived and vouched for Lenard. Daniel remarked that Aftan needed to control her husband. Apparently satisfied with Daniel's explanation, Flowers touched Patrick on the arm and told him to go inside. Lenard and Daniel then left in Lenard's vehicle.

Patrick scolded Aftan for not telling Lenard to leave. Patrick and Aftan claimed that Flowers then grabbed Patrick by his polo shirt and began pounding on his chest. With Aftan's assistance, Patrick was able to break away from Flowers and run toward his garage.[2] Flowers caught up with him and threw him down to the ground in the front yard. Flowers began striking Patrick as he straddled him. With Flowers standing over him, Patrick managed to draw his revolver from the right pocket of his cargo shorts and point it at Flowers. Patrick fired five shots, all of which struck Flowers, who ultimately died from his injuries.

Following the shooting, Aftan administered aid to Flowers. Patrick went into the garage, lit a cigarette, and called his mother-in-law and mother to tell them what had happened. He remained there until police arrived.

---

[2] The garage faced the street.

6

Tina Tomlson and Mike Tomlson lived across the yard from where the shooting occurred.[3]  Their kitchen faced the yard and its window was open.  Tina was in the kitchen when she heard the gunshots and Aftan scream.  She looked out the window and saw Aftan helping Flowers.  She also saw Patrick on the phone.  Mike Tomlson heard the gunshots from his living room.  When he went outside, he saw Patrick walking toward the garage.  He heard Patrick say, "It's okay. He tackled me."  He assumed Patrick said that to Aftan.

Another neighbor, Darold Westall, came outside as well.  He stayed on the phone with the 911 operator as Aftan attempted to stop the bleeding. The Harrises's two school-aged children were inside sleeping at the time.

*Investigation*

Jeffrey Ross was a crime scene investigator with the Bossier City Police Department ("BCPD").  He documented the scene and collected evidence, which was dispersed over an area.  Among the items collected were the revolver, a pack of cigarettes, a single cigarette, and a wallet belonging to Patrick.  The Corvette's engine was still running when Ross was at the scene.

Lieutenant Brad Kalmbach was the crime scene supervisor and property manager for the BCPD.  He collected Patrick's clothes and photographed him.  He found that Patrick was calm and did not appear to have been in a struggle.  Lt. Kalmbach did not notice any physical marks, bruises, abrasions, or anything of that nature on Patrick.  When he

---

[3] The yard was between the Tomlson and Harris homes.

photographed Patrick, he did not see anything which stood out indicating Patrick had been in a struggle.

Detective Karen McDonald, a violent crimes investigator with the BCPD, interviewed Aftan and Patrick at her office. She interviewed Aftan first. Her interview of Patrick took place around 2:00 a.m. She saw a scrape on the inner side of his right leg and a couple of small grass stains on his shorts, but she did not see any signs of the struggle that Patrick described to her.

Det. McDonald read Patrick's rights to him. She then asked him if he would acknowledge that she had done so by signing the back of the rights card. The back of the card contained a waiver, which she did not read to him. Patrick asked her, "This is not waiving anything, right?" Det. McDonald replied, "No sir, it's just to acknowledge that I read this card to you."

Patrick told Det. McDonald that Flowers became belligerent when he asked Aftan why the car was there. He described how Flowers stood over him and had pushed him to the ground three times. He told the detective that he was on the ground and Flowers was "straight up" at his feet. Flowers was threatening him, saying "Get up" and "Do it." He said he was scared for his life, and that Flowers had already held his (Patrick's) breath before.

*Pre-trial proceedings*

Patrick was indicted for the second degree murder of Flowers. A free and voluntary hearing regarding Patrick's statement to Det. McDonald was held on June 30, 2017. The trial court conceded that Patrick's question, "This is not waiving anything, right?", at first appeared troubling. However, when that question was evaluated in light of the totality of the circumstances

8

surrounding the interrogation, the isolated question did not seem to indicate a lack of understanding or appear to be a misrepresentation that would require suppression of his statement. The court concluded that the State had met its burden of proving the validity of the waiver by a preponderance of the evidence. Patrick applied for a supervisory writ, which this court denied on March 22, 2018. The supreme court denied his writ on August 31, 2018.

## TRIAL

A bench trial was held in this matter beginning on May 8, 2019. However, due to certain delays, the trial concluded on August 28, 2019.

Patrick testified that Flowers nearly strangled him on the trampoline, and he believed that he blacked out during the episode. Patrick attributed Flowers' behavior on the trampoline to showing off and wanting to be the alpha male.

Stephen McCann, the party's host, described the trampoline incident at trial. When Patrick fell facedown, Flowers got on top of Patrick's back and placed him in a chokehold. Patrick told Flowers, "Okay, you got me." Patrick also began tapping on the trampoline mat to indicate he was finished, but Flowers continued to choke Patrick to the point where he was no longer able to speak and was close to being unconscious. McCann told Flowers to release Patrick, but Flowers did not respond. McCann had to climb on the trampoline and pull Flowers off Patrick. He recalled that Patrick was able to catch his breath in a couple of seconds. Flowers then told McCann that he was ready to wrestle him, who replied that wrestling was over for the night. McCann had not observed any animosity or unfriendliness between Patrick and Flowers before that incident.

Jennifer Alexander was the supervisor of Flowers and Patrick at AT&T, and she had worked with them since 2006. She was close to Flowers and his wife, having socialized with and gone on vacations with them. Alexander testified that the relationship between Patrick and Flowers became a little rocky after the affair, but once Patrick returned to work from his elbow injury, it was almost like nothing had ever happened. They worked fine together, and everything seemed to be normal. She would only put Patrick and Flowers on the same assignment if Patrick requested it. As far as she knew, they had stopped hanging out together outside of work after the affair became public. Patrick never exhibited fear of Flowers in front of her.

Matt Wood was a union representative at AT&T and knew Flowers for 17 years. He testified that Flowers' general reputation among his fellow employees was of someone who was hotheaded and explosive, and who should be avoided. Wood thought Flowers' reputation worsened over the last four to five years of his life.

Defense counsel attempted to elicit testimony from Aftan and Patrick about their knowledge of an incident between Flowers and his wife that occurred in June of 2013. The State objected each time, and the trial judge sustained both objections. A 911 operator and the responding patrol officer were allowed to testify about the incident. Flowers and his wife, Heather, struggled over a weapon during an argument, and a shot went off. Heather called 911 to report that Flowers was locked in a bedroom and threatening to kill himself. She also reported that Flowers had stopped taking his anti-depressants and seeing his therapist. Flowers surrendered to police

negotiators after a few hours and was committed to University Health because of the danger he posed to himself and others.

Patrick testified that he first became fearful of Flowers following the trampoline incident. He had asked Stephen McCann if Flowers could attend the party because Flowers was living by himself in an apartment and was going to be alone that holiday night.

Regarding the affair, Patrick testified that Aftan left for a few days after he learned about the affair. He was angry with Aftan and Flowers, but forgave them. Patrick also went to counseling.

Patrick claimed that he initiated a meeting with Flowers at a Starbucks coffee shop prior to returning to work following the Chili's incident. Patrick thought they needed to talk about how things were going to be since they would be working together again. He recalled that Flowers, who had previously apologized for the trampoline incident, apologized for the affair and the elbow injury. Patrick claimed they decided that would be the last time they would discuss the affair, and would go on with their lives and let the past be the past. Patrick testified that they worked together fine after he returned to work, and while it seemed they were the best of friends, they were really just being cordial during working hours. He did not invite Flowers to his house or go out with him after that.

Aftan testified that she became angry when Patrick told her of his plans to go with Flowers to buy marijuana from Young. She never wanted to see Flowers again.

Patrick claimed that Flowers was somber and not very talkative when Flowers picked him up. He seemed down to Patrick. Patrick also claimed that Flowers indicated to him that evening that he was considering harming

11

himself. Patrick became concerned about their safety during the drive because Flowers was driving erratically.

Young was aware there were past issues between Flowers and Patrick, but he did not notice any problems between them that night. As far as he knew, they were trying to mend their relationship. They seemed fine at his house and there was no tension.

Patrick testified that when he saw Lenard's car, he remarked to Flowers that he wondered if it was the same car that had been waiting on Aaron Daniel before, but Flowers did not respond. Patrick suspected that Daniel was dealing drugs.

Lenard testified that Patrick came to his passenger side window and asked, "Why the f**k are you parked in front of my house?" Patrick also asked him, "Why my house?" a couple of times, then said, "This is a good way to get shot. Do you want to get shot tonight?" Patrick seemed agitated to Lenard, and while Patrick was not screaming, he spoke to Lenard in an elevated and serious tone. Lenard was fearful but never saw a weapon or was threatened with a weapon. Lenard believed that Patrick was trying to intimidate him into leaving. Lenard also testified that he felt threatened when Flowers placed his hands on Lenard's car.

Lenard recalled that after Flowers realized he was being truthful about waiting on Aaron, Flowers told Patrick, "Come on, man, let's just go inside. Let's just go inside. It's nothing." Flowers touched Patrick lightly on the arm like he was trying to pull him away. He did not see them arguing. The last thing Lenard saw before driving away was Patrick, Aftan, and Flowers talking.

Less than five minutes after they left, Lenard saw BCPD vehicles driving at a high rate of speed in the direction of the neighborhood. Aaron Daniel received a text from his mother asking if he was okay because she had heard shots.

After stepping away from Lenard's car, Patrick began to fuss at Aftan for not getting Lenard to move before he got there. Patrick testified that Flowers then grabbed him by the shirt and started pounding on his chest with his shirt in his hands and saying, "I can't do this anymore. I cannot be your friend anymore. I can't do this." Patrick described Flowers' action as a violent shoving back and forth.

According to Patrick, he tried to back away by breaking Flowers' grip on him. In the meantime, Aftan was trying to pull Flowers back. Patrick stated that he was eventually able to break free, but the momentum from pulling away caused him to fall down to his left knee, and when he got back up, he was pushed back down on his right arm.

Patrick testified that he was able to get up from the ground and run towards the garage because Aftan was holding Flowers back. He wanted to get away to call 911. He claimed that when Flowers broke free from Aftan and caught up to him, Flowers grabbed him from behind and threw him down on his right arm. He hit the ground and rolled over. He tried to get back up, but Flowers straddled him, with Flowers' knees on the ground around Patrick.

Patrick recalled that Aftan was trying to pull Flowers off while telling Flowers to stop. Both of them were telling Flowers to leave. Patrick testified that as he tried to protect his head because of his recent eyelid surgery, Flowers was punching him on the head, arms, and torso.

13

Patrick explained that he rolled over to his left and reached for the revolver which was partially hanging out of his right front pocket. When he pulled the revolver out, Flowers, who was still being pulled on by Aftan, moved back a little bit. However, according to Patrick, even after he pointed the revolver at Flowers and told Flowers to stop and leave him alone, Flowers still came at him and reached for the revolver. Patrick claimed Flowers said that he knew what he would do to him and that Patrick had better shoot him.[4] Patrick testified it scared him that Flowers was in range to take the gun, and he thought Flowers would surely kill him if he did not fire his weapon. Patrick was scared for his life. Patrick remarked that despite having a gun pointed at him, Flowers never stopped or retreated, and he never threw up his arms and said "don't shoot." Instead, Flowers did the opposite and came at him.

Patrick explained that Flowers was not standing erect at his feet when he fired. He claimed that Flowers was straight up at his feet at one point, but not when he fired. Flowers was on top of him, straddling him, and reaching for the gun as he pointed it at him, and Patrick told Flowers to stop and leave him alone.

Patrick described how Flowers was still kneeling when he pulled out the revolver, but then stood up erect when Patrick shot him. Patrick did not think Flowers was going to fall because he was just standing there. He thought he had missed Flowers, but then Flowers fell backwards toward the sidewalk. Asked if Flowers continued to stand erect after he finished firing, Patrick replied, "It seemed that way. It was a - - it was a horrifying

---

[4] "You know what I'll do. You are going to have to shoot me, mother***er" or "You know what I've done to you before and you better shoot me, mother***er."

14

situation." When he finished firing, Patrick extended his right arm out and let the revolver fall from his hand onto the grass.

Patrick testified that in the aftermath, a neighbor, Darold Westall, asked him what he had done, and he replied that Flowers had attacked him. Patrick believed that Flowers snapped that night as Flowers' actions in his yard took him by surprise. Patrick testified that he knew what Flowers had done to him before, Flowers was going to go as far as he could, and it made Patrick fear for his life. He was fearful that Flowers would take the gun and turn it on him. Patrick denied that he shot Flowers out of revenge for the affair.

Aftan testified that after Lenard and Daniel drove away, she was trying to move her husband and Flowers to the garage to smoke with her and calm down. Flowers grabbed Patrick by the front of his shirt and began pounding him in the chest by pulling forward on his shirt and then pushing back against his chest. She recalled that Flowers told Patrick that he was sick of this and tired of trying to be his friend.

Aftan described how she grabbed Flowers by the neck to pull him away from her husband, who was able to break free. Patrick ran toward the garage while she momentarily held Flowers back. Patrick took a few steps before falling. Flowers then ran after Patrick.

Aftan testified that her husband made it to the edge of the garage before Flowers grabbed Patrick from behind with his arms wrapped around Patrick. Flowers lifted Patrick, brought him back a short distance, and then threw Patrick to the ground. Patrick landed on his right arm.

According to Aftan, Flowers then straddled Patrick's legs while down on one knee and bent over. Patrick was in the fetal position on his right side

15

as he tried to protect his face and elbow with his left arm while Flowers struck him with hard blows mainly to his torso.

Aftan testified that she pleaded with Flowers to stop as she pulled him by the waist in an effort to get him off her husband. When she was able to pull Flowers back enough, Patrick rotated out of the fetal position, drew his weapon, and asked Flowers to stop. Aftan explained that at that point, Flowers was out of his kneeling position and now standing over Patrick, whose legs remained between Flowers' legs the entire time. Aftan denied that Flowers was below Patrick's feet.

Aftan testified that Flowers told her husband, "Shoot me motherf***er. Shoot me." She recalled that when Flowers said this, he was not standing straight up, but was standing with his upper body curved over the top of Patrick. Flowers was leaning forward and reaching for the revolver. She remembered Flowers being close enough to take the revolver. Patrick fired when Flowers lunged at him.

According to Aftan, she was still holding onto Flowers by his waist when the first shot was fired. She screamed and let go. She recalled that Flowers took three steps backwards and then fell back. She went to his aid before going to the garage to get a phone to call 911. She then returned to Flowers in order to apply pressure to his wounds. She recalled that Patrick was still in the yard when she went to get the phone, but did not know if he had remained there when she returned to Flowers.

Aftan testified that she had not met with Flowers from February of 2014 until the night of the shooting. She still had feelings for Flowers and did not want to see him or her husband get hurt.

16

### Interviews with Detective McDonald

Detective McDonald testified at trial that Patrick became tearful at times during the interview. He told her more than once that he had been in fear for his life. She agreed that she did not press Patrick for more details after he told her that Flowers had put him in a position before where he thought he was going to die. She testified that she did not ask Patrick exactly what Flowers had done to him previously. That did not seem important to her at the time of the interview.

Patrick testified that he told Det. McDonald that Flowers stood over the top of him and dared him to get back up. He also testified that he told her that Flowers pushed him to the ground twice and wrestled him to the ground once.

Patrick explained that while he was sober during the interview, he was extremely rattled and shaken. It was very difficult for him to understand what had happened, much less talk about it and explain the way it occurred. He believed that he would be asked additional questions about the shooting later. Det. McDonald did not press him for details when he mentioned what Flowers had done to him before.

Aftan testified that she told Det. McDonald and a BCPD officer that Flowers was the aggressor, that he attacked Patrick, and that Patrick had tried to get away. She also claimed she told them that Flowers had hurt Patrick before.

### Autopsy

Dr. Frank Peretti, who performed Flowers' autopsy on March 25, 2016, testified as an expert in forensic pathology. He was unable to determine the sequence in which the shots were fired. One bullet entered the

right side of the neck, went through the spinal cord, and ended in the left side of the neck. That shot would have immediately incapacitated Flowers.

Another bullet caused a superficial graze wound to his right interior forearm, just above the thumb side of the wrist, and then entered the right side of the chest. The bullet lodged in the right lung. Dr. Peretti could not determine whether the thumb was facing up or down when the wound was received. He also could not tell whether the wound was received when Flowers was actually reaching for something. However, because the wound went across the wrist, he agreed this meant the hand would not have been pointed in the direction of the weapon. He thought the wrist wound was consistent with a defensive position, even though he could not characterize it as one, and the wrist would have been in front of Flowers' chest when the bullet struck. That shot did not lead to a fatal wound immediately. Flowers would have been able to continue moving if that was the first shot.

The third bullet was to the left upper chest but did not enter the chest cavity. It was a flesh wound and the bullet ended in the shoulder. A fourth bullet caused a flesh wound as it grazed the left costal margin and ended in the back without entering the chest. Flowers would have remained ambulatory after receiving those two wounds.

A fifth bullet entered the subcutaneous tissue on the back of the neck and hit the occipital skull bone. Although that bullet did not enter the brain, the impact from it caused subarachnoid hemorrhaging. That injury would have immediately incapacitated Flowers. In summary, Flowers would not have remained standing after that shot or after the shot which fired the bullet that struck his spinal cord. His hands would have dropped immediately if raised at the time the bullet struck his spinal cord.

18

Dr. Peretti did not find any burn or powder marks around the wounds or any evidence of close-range firing on the skin. He opined that the wounds were all from shots fired no closer than 24 inches away. Anything more than 24 inches away is considered a distant shot. All of the bullets were fired at an upward trajectory, with upward meaning the angle of the muzzle relative to the target. He could not determine precise angles. Dr. Peretti agreed that impact from a bullet could move a body some, but did not know whether it did and to what extent in this matter.

The toxicology report showed that Flowers had antidepressants within therapeutic range in his system. His alcohol levels were .078 in his blood, .093 in his vitreous fluid, and .155 in his urine. While Flowers received blood as the paramedics tried to save him, that would not have affected the alcohol levels found in his urine or vitreous fluid.

*Firearms identification expert*

Richard Beighley, the firearm section supervisor of the North Louisiana Crime Lab, testified as an expert for the State in firearm identification. He explained that to determine the distance from a muzzle to a target, he begins by looking for gunshot residue deposited on the target or on something in between the target and the muzzle. If he finds a gunpowder pattern, then he will try to duplicate that pattern by firing the weapon to determine a muzzle-to-target distance.

Beighley examined a long-sleeve shirt that had been worn by Flowers and which had eight holes. Using a stereo microscope, he looked at areas around each of the holes for gunpowder residue. He did not find any type of gunpowder residue in the area of any hole. Beighley explained that

19

the absence of a gunpowder pattern on the shirt precluded him from making a more definite determination of distance.

Beighley explained that a rule of thumb he sometimes utilized for a .38 is there would be a pattern present if the gun was fired within three feet of the target, and there would be traces of gunpowder present if it was fired beyond three feet and up to six feet away. He would probably not find any gunpowder residue if the .38 was fired from more than six feet away.

Although he did not find a pattern, he did find a total of ten partially burned or unburned gunpowder particles. Four of those particles were discovered on the examination paper while he was handling the shirt. The other six particles were found after he performed a debris collection from the shirt.

Beighley did not consider 10 particles of gunpowder to be much considering five shots were fired. He believed that he would have found a lot more than 10 particles of gunpowder if the gun had been fired three feet away, or at arm's length. However, he would not have expected to find any gunpowder on the shirt whatsoever if the distance had been more than six feet as gunpowder from a .38 would not travel beyond six feet.

Beighley concluded that in order to get the 10 particles of gunpowder that he found, at least one shot was fired less than six feet away from Flowers, and it could have been as close as three feet.

*Expert crime scene analysis*

Owen McDonnell testified on behalf of Patrick as an expert in crime scene analysis. He reviewed the reports, statements, physical evidence, and measurements taken at the crime scene.

20

Aftan testified that Patrick's wallet and pack of cigarettes fell out of his pocket when Flowers was slinging him around. The wallet and pack of cigarettes were found 3.9 feet from the revolver. The pack of cigarettes appeared to be crushed, which McDonnell thought could have occurred when someone fell on them. A loose cigarette was also found in the grass. McDonnell believed that the distribution of the wallet, gun, and cigarettes on the grass was consistent with an altercation in the front yard. The position of the revolver was also consistent with Patrick's statement that he was on his back and deposited the gun out to his side after he finished firing it.

McDonnell reviewed photos of Patrick taken by Lieutenant Kalmbach. He noted that Patrick's polo shirt showed some stretching around the neckline, as well as wrinkles and other stretched areas. Patrick had a slight redness to his chest. McDonnell thought the chest redness and shirt wrinkling were consistent with Flowers grabbing Patrick by the front of his shirt and pounding him in the chest. McDonnell also noted a scrape on Patrick's left shin and scrape marks on the inside of his right knee and right upper leg.

Patrick was wearing cargo shorts during the altercation. McDonnell noted grass stains on the shorts in three distinct areas. There was a group of grass stains along the right cargo pocket. Those stains were consistent with someone lying on their side. There was also a grass stain on the left front side in the area of a cargo pocket. McDonnell could not say whether Patrick was on his left side or on his front when that stain was made, but at one time the front of the left pocket came into contact with the grass. McDonnell explained that because those stains were separated, that meant the stains were from separate contacts with the ground. They were also consistent

21

with Patrick's statement that he was on his right side and that he fell to the front at one point. Finally, there were grass stains that stopped at the top of the back of the shorts on one side. McDonnell testified that the stains on the back were lineal, which showed they could have been caused by contact with grass during a rocking movement. He believed that the stain on the back of the shorts was consistent with Patrick's statement that he rotated to his back.

McDonnell noted a small grass stain at the top of one of Patrick's socks, as well as dirt along the side of his right shoe. He concluded that Patrick's scrapes, the grass stains, and the dirt on the shoe showed that Patrick was in contact with the grass at least three different times.

McDonnell observed a substantial amount of dirt on the side of Flowers' right shoe. He thought this dirt was consistent with a person leaning down and having the side of their foot in contact with dirt.

McDonnell testified that Dr. Peretti's report that the wounds were at an upward trajectory was consistent with Patrick's statement that he was on the ground and fired upward. He also testified that under nationally-accepted guidelines, the absence of gunpowder residue is not a basis for expressing a distance determination.

McDonnell concluded that none of the physical evidence he observed was inconsistent with Patrick's or Aftan's statements as to how the events happened. The grass and dirt stains, markings, wrinkles, and abrasions supported the general framework of what Patrick and Aftan told him had occurred. In particular, the statement that Patrick was on the ground multiple times was consistent with the scrape found on his left shin, the scrapes inside of his right upper leg above the knee, and the separation of

22

stains on his shorts.  Aftan's and Patrick's statements about the altercation are the most likely explanation for how the physical evidence resulted.

***Ruling***

The trial court gave extensive oral reasons for finding Patrick guilty of manslaughter.  The court was not certain that Patrick passed out during the trampoline episode.  Despite what happened to Patrick on the trampoline, he continued his friendship with Flowers.  Regarding the Chili's incident, the court was not convinced that Flowers actually used the word "assault" when he called 911.  The court did not think Patrick lost consciousness when his elbow was fractured.  The court found it extremely telling that the physician who did the PEC indicated that Patrick was homicidal and violent.  Alcohol abuse was listed first in the final diagnosis, making it the condition requiring the most treatment.  The court noted that despite the broken elbow, Patrick accepted a loan from Flowers, they continued to be friends, and they continued to work on jobs at the request of Patrick.  The court also noted the two-year gap between the Chili's incident and the shooting.

Lenard was found to be a credible witness.  Patrick's testimony about Flowers driving erratically during the marijuana errand was not believed by the court.

The court could not make sense of the testimony about what occurred from the time that Lenard drove away until the shooting.  In reference to McDonnell's testimony, the court wondered which statements from Patrick and Aftan were consistent with the physical evidence since their own statements differed depending on when they were made.  The court specifically noted that Aftan contradicted herself in a couple of ways.  Later, at sentencing, the court was very blunt about her lack of credibility, stating

23

that it had been correct in attaching absolutely no credibility to her testimony.

The court addressed what the photographs of the clothing showed and did not show. There were some grass stains on Patrick's pants, but there was no stretching on the polo shirt that indicated there was pounding back and forth. The shoes, socks, and shirt were in pristine condition. While there was a mark on Patrick's chest, the court did not see any abrasions on his legs.

The court believed there had been an altercation before the shooting and that Patrick was agitated. The court believed that Flowers was standing over Patrick, but not that he lunged for the gun. Finally, the court noted the testimony from Patrick and Aftan that Flowers took a few backward steps after being shot. There was no indication that the shots would have caused that, especially considering that according to Dr. Peretti, two of the shots would have dropped him. In conclusion, the court found that the State proved beyond a reasonable doubt that no reasonable person could have believed that Patrick was in imminent physical harm that night.

The guilty verdict was rendered on August 28, 2019. Patrick filed a motion for a post-verdict judgment of acquittal on October 31, 2019. A sentencing hearing was held on November 5, 2019. Two weeks later, Patrick filed a motion to reconsider sentence on the grounds that his sentence was excessive. He argued that the trial court gave too much weight to certain unnamed factors, but then failed to give appropriate weight to particularized La. C. Cr. P. art. 894.1 factors. The motions were denied.

Patrick has appealed his conviction and sentence. He argues: (1) the evidence was insufficient to support his manslaughter conviction as the State

failed to prove beyond a reasonable doubt that he did not act in self-defense; (2) the admission of his statement to Detective McDonald violated his right against self-incrimination under the United States and Louisiana Constitutions; (3) the trial court erred in not allowing Patrick to testify about his knowledge of Flowers' violent behavior; and (4) his sentence is excessive.

**DISCUSSION**

When issues are raised on appeal both as to sufficiency of the evidence and as to one or more trial errors, the reviewing court must first determine whether there was sufficient evidence to convict. *State v. Hearold*, 603 So. 2d 731 (La. 1992).

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/06/09), 21 So. 3d 297.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d

25

62 (2000). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 50,643 (La. App. 2 Cir. 6/22/16), 197 So. 3d 717, *writ denied*, 16-1479 (La. 5/19/17), 221 So. 3d 78; *State v. Gullette*, 43,032 (La. App. 2 Cir. 2/13/08), 975 So. 2d 753. The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Green*, 49,741 (La. App. 2 Cir. 4/15/15), 164 So. 3d 331.

Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. *State v. Lilly*, 468 So. 2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. *Id.* When the State relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Lilly*, *supra*; *State v. Green*, *supra*.

The appellate court reviews the evidence in the light most favorable to the prosecution and determines whether an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Calloway*, 07-2306 (La. 1/21/09), 1 So. 3d 417; *State v. Garner*, 45,474 (La. App. 2 Cir. 8/18/10), 47 So. 3d 584.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the

26

witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Green*, *supra*; *State v. Glover*, 47,311 (La. App. 2 Cir. 10/10/12), 106 So. 3d 129, *writ denied*, 12-2667 (La. 5/24/13), 116 So. 3d 659. Such testimony alone is sufficient even where the State does not introduce medical, scientific, or physical evidence. *State v. Larkins*, 51,540 (La. App. 2 Cir. 9/27/17), 243 So. 3d 1220, *writ denied*, 17-1900 (La. 9/28/18), 253 So. 3d 154. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000).

As relevant to the facts of this case, manslaughter is defined in La. R.S. 14:31(A)(1) as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

A homicide is justified when it is committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1). Patrick asserted that he acted in self-defense. When self-defense is raised as an issue by the defendant, the State has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. *State ex rel. D.P.B.*, 02-1742

27

(La. 05/20/03), 846 So. 2d 753; *State v. Allen*, 50,703 (La. App. 2 Cir. 8/10/16), 200 So. 3d 376, *writ denied*, 16-1734 (La. 9/6/17), 224 So. 3d 981. When the defendant challenges the sufficiency of the evidence in a self-defense case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Matthews*, 464 So. 2d 298 (La.1985); *State v. Allen*, *supra*.

Patrick argues that no reasonable trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. He asserts that the State's case was based on circumstantial evidence that failed to exclude a reasonable hypothesis of innocence. This hypothesis was that based on the great bodily harm caused by Flowers in the past and Patrick's knowledge of Flowers' reputation for explosive and erratic behavior, he reasonably believed his actions were necessary to avoid imminent danger of great bodily harm or death. The State argues in opposition that the evidence actually proved all the essential elements of second degree murder, but the trial judge noted mitigation and returned a responsive verdict of manslaughter.

The evidence presented at trial established beyond any reasonable doubt that Patrick reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm that night in his yard, and that shooting Flowers was necessary to save himself from that danger. We therefore conclude that he acted in self-defense.

There was nothing in the record indicating that Patrick had acted aggressively toward Flowers in the past, including when he learned of the

28

affair two years before the shooting. On the contrary, Flowers acted without provocation when putting Patrick in a chokehold on the trampoline. It took the intervention of a third party to free Patrick and possibly prevent a severe injury.

Emotions were obviously high at the Chili's restaurant considering Patrick had recently learned of his wife's infidelity with Flowers, yet Patrick was the one who left the scene with a serious injury. The trial judge seemed to minimize Patrick's injury and instead focused on his mental condition at the hospital as documented in the medical records, which were a joint exhibit. Notably, there was no testimony at trial from any of the personnel at the hospital elaborating on Patrick's mental condition that night.

The two incidents occurred two years before the shooting, and by all accounts, there were never any subsequent problems between Patrick and Flowers until the shooting. However, both incidents had occurred outside of work, and Patrick had limited his interactions with Flowers after working hours.

Without question, Patrick overreacted to Lenard's presence when he returned with Flowers, who presented a threatening presence to Lenard as well. It is not entirely clear what provoked Flowers to begin shoving Patrick. There is nothing in this record contradicting Patrick's assertion that he attempted to escape to the garage, but was prevented from doing so by Flowers. Whether Patrick incorrectly counted the number of times he was pushed to the ground is immaterial. This was a fast-moving, dynamic situation.

It is also immaterial whether Flowers was standing entirely upright or standing over Patrick when the first shot was fired, even if Flowers, as found

29

by the trial court, was not reaching for the revolver. Dr. Peretti testified that all the shots were fired at an upward trajectory, which supports Patrick's claim that he was on the ground when he fired the revolver. The State's firearm expert testified that at least one shot was fired at a distance no closer than three feet and no farther away than six feet between the muzzle and the target. A distance of three to six feet between the muzzle and the target is not much separation when: (1) Flowers had a history of acting violently toward Patrick; (2) Flowers suddenly started shoving Patrick in his yard; (3) Flowers pursued Patrick when he tried to retreat to his garage; and (4) Patrick was in the strategically vulnerable position of being on the ground at the feet of Flowers when Flowers had already overpowered him.

In summary, even when the evidence is viewed in the light most favorable to the prosecution, we find that no rational trier of fact could have found beyond a reasonable doubt that the homicide of Flowers was not committed in self-defense. Because we reverse the manslaughter conviction of Patrick, it is unnecessary for this court to address his remaining assignments of error.

## DECREE

For the foregoing reasons, the conviction and sentence of Patrick Newton Harris are reversed, and defendant is ordered discharged.

REVERSED.

30

**BLEICH, J. (*Pro Tempore*) concurring,**

Moments before the shooting, defendant had just – for the fourth separate time – been attacked by Flowers.

The conviction rendered in this case must be reversed.

As stated in the original opinion, this court is mandated to review the sufficiency of the evidence supporting the conviction under the standards set forth in *Jackson v. Virginia* and La. C. Cr. P. art. 821. Further, under the *Jackson* standard, this court is constrained to consider all of the evidence introduced at trial "regardless of whether that evidence was admitted erroneously." *McDaniel v. Brown*, 558 U.S. 120, 138, 130 S. Ct. 665, 676, 175 L. Ed. 2d 582 (2010); *State v. Lamothe*, 98-2056 (La. 11/25/98), 722 So. 2d 987; *State v. Hearold*, 603 So. 2d 731 (La. 1992); *State v. Robinson*, 51,830 (La. App. 2 Cir. 2/28/18), 246 So. 3d 725, *writ denied*, 18-0573 (La. 2/11/19), 263 So. 3d 725; *State v. Major*, 19-0621 (La. App. 1 Cir. 11/15/19), 290 So. 3d 1205, *writ denied*, 20-00286 (La. 7/31/20), 300 So. 3d 398.

This writer has refrained from substituting his judgment for that of the trier of fact relative to the credibility of witnesses. Indeed, the learned trial judge was required to make some difficult credibility decisions and he was most conscientious in performing that responsibility.

Succinctly, the primary issue before us is whether the State of Louisiana proved, beyond a reasonable doubt, that defendant did not act in self-defense. This issue was thoroughly examined by this panel under the

1

*Jackson* standard. Our analysis involved consideration of the entire record, including admissible as well as inadmissible items of evidence.[1]

While giving great deference to the trial court's assessment of credibility and the *Jackson* standard, the record contains objective items of evidence which are compelling and not subject to contradiction. This evidence is considered in the context of the state's burden of proving beyond a reasonable doubt that defendant did not act in self-defense.

At trial, there was much testimony, both lay and expert, concerning the distance between the pistol and Flowers, whether the victim lunged for the pistol or whether he was standing at defendant's feet. Yet, one uncontradicted fact gleaned from all of the testimony and evidence is that defendant fired each shot in an ***upward direction***. As a result, there can be no dispute that Flowers was in a superior position to defendant, who was lying on the ground in his own yard.

There can be much speculation about what happened and whom to believe. However, from a ***forensic standpoint***, it is indisputable that Flowers was positioned over the defendant while he was on the ground. It is illogical

---

[1] This writer considered, under the *Jackson* standard, the defendant's inculpatory statement, which was a pivotal consideration of the trial court as to defendant's credibility at trial. The trial court indicated in its written ruling that the statement, at least in part, suggested that defendant was not credible, thus leading to his conviction. In this writer's opinion, the inculpatory statement should not have been considered at all. The record shows that defendant was misled by the officer, intentionally or unintentionally, while "waiving" his rights. At one point, the trial court expressed concern over this issue. Most importantly, the trial court adopted an incorrect standard for admissibility of the inculpatory statement, requiring that the state prove admissibility by a "preponderance of the evidence." (Trial court opinion, R.p. 163). Rather, the burden for admitting such a statement is "beyond a reasonable doubt." La. C. Cr. P. art. 703(D); *State v. Hunt*, 09-1589 (La. 12/1/09), 25 So. 3d 746; *State v. Odums*, 50,969 (La. App. 2 Cir. 11/30/16), 210 So. 3d 850, *writ denied*, 17-0296 (La. 11/13/17), 229 So. 3d 924.

It is emphasized that although the facial inadmissibility of defendant's statement was not considered by this writer, the trial court's error, by itself, would have been the basis for ordering a new trial if not for this writer's agreement with the ultimate result reached by the majority.

2

to conclude that defendant had placed himself on the ground as Flowers casually approached him.  The forensic evidence concerning the striking of the bullets and the physical positions of the two principals corroborates the details of defendant's testimony relative to the moment of shooting.

Furthermore, the cigarette package and a single cigarette in a separate location scattered across the ground were independently corroborative of the second confrontation between defendant and Flowers.

Thus, the objective forensic evidence and the location of other physical evidence demonstrate that a reasonable doubt exists concerning the failure to prove that defendant did not act in self-defense.

For these additional reasons, this writer concurs in the original opinion.