**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3528-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JULE HANNAH, a/k/a
JULE L. HANNA,

     Defendant-Appellant.

_____

        Submitted May 6, 2024 – Decided August 9, 2024

        Before Judges DeAlmeida, Berdote Byrne, and Bishop-Thompson.

        On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 18-03-0226.

        Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

        Matthew J. Platkin, Attorney General, attorney for respondent (Bethany L. Deal, Deputy Attorney General, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Following a jury trial, defendant, Jule Hannah, was convicted of first-degree murder (count one), and second-degree unlawful possession of a weapon (count three). He was sentenced to forty-five years in prison, eighty-five percent of which was to be served without parole eligibility on count one. Defendant was also sentenced to ten years in prison with five years of parole ineligibility on count three, concurrent with the forty-five-year sentence for murder.

On appeal, defendant raises the following contentions:

> POINT I: DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE IMPROPER INTRODUCTION OF LAY OPINION TESTIMONY THAT DEFENDANT WALKED WITH THE SAME UNIQUE GAIT USED BY THE PERPETRATOR AS CAPTURED IN SURVEILLANCE VIDEO. U.S. Const. amends. V and XIV; N.J. Const. art. I, [¶¶] 1, 9, and 10. (Not Raised Below)

> POINT II: WHERE EXPERT TESTIMONY ON HISTORICAL CELL SITE ANALYSIS WAS REQUIRED, THE INTRODUCTION OF UNRELIABLE LAY WITNESS TESTIMONY DENIED DEFENDANT HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL. U.S. Const. amends. V and XIV; N.J. Const. art. I, [¶¶] 1, 9, and 10.

> POINT III: THE FAILURE OF THE TRIAL COURT TO VOIR DIRE A SLEEPING JUROR DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR AND

IMPARTIAL JURY, AND REQUIRES THE REVERSAL OF THE CONVICTIONS. U.S. Const. amends. VI, VII, XIV; N.J. Const. art. 1, [¶¶] 9, 10.

POINT IV: EVIDENCE DISCOVERED ON DEFENDANT'S CELL PHONE MUST BE SUPPRESSED BECAUSE THE "WARRANT TO SEIZE" WAS AN UNCONSTITUTIONAL GENERAL WARRANT THAT DID NOT SUFFICIENTLY DESCRIBE THE ITEMS TO BE SEIZED NOR PROVIDE ANY LIMITATION ON WHEN THE WARRANT COULD BE EXECUTED. U.S. Const. amends. IV and XIV; N.J. Const. art. I, [¶] 7.

POINT V: DEFENDANT DID NOT KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY GIVE HIS STATEMENT TO [THE POLICE].

POINT VI: EVIDENCE OF DEFENDANT'S MOTOR-VEHICLE SUMMONSES AND VIDEO OF HIS 2011 STOP WERE NOT PROPERLY ADMITTED AT TRIAL.

POINT VII: OFFICER IACOVONE'S TESTIMONY ABOUT DEFENDANT'S SISTER WAS HEARSAY AND VIOLATED THE CONFRONTATION CLAUSE.

We conclude the trial court erred in allowing a police officer to present lay person testimony regarding various cell phone records after he failed to qualify as an expert. We vacate the conviction and remand for a new trial on counts one and three.

A-3528-21

I.

We discern the following facts from the record. On January 15, 2017, at approximately 8:30 a.m., Tina Acevedo was asleep in her home on Spruce Street in Bridgeton when she was awoken by a loud bang outside. She immediately jumped out of bed, looked out her bedroom window, and saw a man with a distinct limp and a puffy jacket walking rapidly down the road, away from a car. She saw only the side of the man's face for a few seconds. She then noticed the car had crashed into her neighbor's tree and a man (later identified as Miguel Lopez, the victim) was slouched over the driver's seat, dead. Lopez had been shot four times, with the shots fired from the passenger seat of his vehicle. The Bridgeton Police Department (BPD) recovered four shell casings, all from the same firearm. Fingerprints were also found in the vehicle. A cigar butt with a plastic filter tip from the front passenger seat of the victim's vehicle was also recovered. The cigar butt was later determined to match defendant's DNA.

Acevedo provided BPD with video surveillance footage captured from her home's security system (the Spruce Street footage). The Spruce Street footage depicted what BPD believed to be a suspect walking with a distinctive limp requiring him to lift his left foot before taking each step.

4

Two days later, police brought in a potential suspect who wore a camouflage jacket and walked with a limp for questioning. He was ultimately released when BPD noticed the jacket was the wrong type and had no blood splatter on it, the suspect's limp affected the wrong leg, and no evidence connected him to the murder.

Detective Kenneth Leyman (Leyman), who claimed he knew defendant from previous interactions, reviewed video footage of defendant unrelated to the crime, recorded on various dates at the Cumberland County courthouse, and footage from a traffic stop in 2011. The comparison of those videos, specifically defendant's distinctive limp, with the Spruce Street footage eventually led BPD to identify defendant as a potential suspect.

As part of the investigation, BPD also obtained surveillance footage from various locations in South Jersey to retrace the victim's path the morning of January 15. From the accumulated surveillance footage, BPD learned the victim was with a friend at Caesar's Hotel and Casino in Atlantic City, on January 14 until the early morning hours of January 15. At approximately 6:30 a.m., the victim left Atlantic City and drove east. About one hour later, at around 7:30 a.m., the victim's vehicle was seen at Cacia's Bakery in Williamstown and thereafter headed south towards Bridgeton. Additional footage recovered from

5

739 Parvins Mill Road showed the victim proceeding down Parvins Mill Road and continuing southwest towards Bridgeton at 7:54 a.m. The victim's vehicle was then seen on surveillance footage from a drugstore at approximately 8:03 a.m., continuing towards Bridgeton. Footage from a patrol car revealed the victim drove towards Bridgeton before turning onto Rosenhayn Avenue. A recording from 571 North Burlington Road and 181 North Burlington Road further captured the victim continuing southbound towards Bridgeton. A convenience store then placed the victim at the intersection of North Burlington Road and Commerce Street at approximately 8:20 a.m. BPD also recovered a recording of a phone call made by the victim's friend's father to the victim around this same time, which appeared to capture the voice of an unidentified second person in the car with the victim.

Contemporaneously, BPD began an investigation into defendant. It learned of motor vehicle summonses issued by the Monroe Township Police Department (MPD) to defendant on the morning of the murder. The motor vehicle summons cited defendant for leaving the scene of a one-car accident and failing to report the accident in the vicinity of Williamstown-Franklinville Road and Tuckahoe Road that same morning.

6

James Burnett (Burnett), a paper delivery driver for the Williamstown area, drove past the accident and saw a vehicle on the side of the road. Burnett pulled over and contacted the MPD. While there, Burnett stated and later testified he encountered a bald, African American man who walked with a "slight limp." The man offered Burnett $100 for a ride to Bridgeton, but Burnett declined because he was still working and left to finish his delivery route. He testified at trial he did not have an opportunity to see the man's face. When Burnett returned to the scene of the accident approximately twenty-five minutes later, the man he encountered was gone. The only person present was MPD officer Carmen Iacovone (Iacovone), who, after speaking with Burnett and locating the owner of the car, defendant's sister, issued the motor vehicle summonses to defendant for leaving the scene of an accident and failing to report it.

BPD also served a Communications Data Warrant (CDW) upon defendant's cell phone provider for defendant's cell phone records on February 8, 2017. Using the records, Leyman plotted the towers to which defendant's calls or texts connected between the time of his one-car accident on Franklinville-Williamstown Road to the homicide. Due to defendant's presence near the intersection of Williamstown-Franklinville Road and Tuckahoe Road

around the time the victim was at the nearby Cacia's Bakery, BPD theorized the victim picked up defendant on the side of the road after defendant crashed his vehicle as the victim drove south towards Bridgeton.

Based on this information, BPD sought to seize "cellular device(s) belonging to and/or in the possession of" defendant. The warrant was issued on February 13, and defendant's cell phone was seized nine days later on February 22, when Leyman pulled over a vehicle with defendant in the passenger seat. Defendant read the seizure order and asked Leyman why the warrant referenced murder. As Leyman stood beside defendant, he detected the odor of marijuana coming from inside the vehicle. A search warrant was issued the next day for the vehicle, which uncovered drugs. The following day, February 24, BPD executed a search warrant at defendant's residence. A gun cleaning kit was found in the backyard, but no gun was ever recovered.

Defendant was taken to BPD headquarters for questioning, but no charges were brought against him at that time. Leyman began the interview by reading defendant his Miranda[1] rights. He asked defendant, "[u]nderstanding those rights, [are] you ok talking to us about this today?" Defendant responded, "About this weed?", to which Leyman responded in the affirmative. After

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

discussing the drugs, Leyman informed defendant he is "not a drug cop, [and does not] do drug work . . . ." Leyman explained BPD was investigating a separate case and had defendant's "whole timeline of events," how defendant ran into a ditch in Monroe Township and then "end[ed] up on the South side . . . ." Leyman then showed defendant the victim's picture. Defendant denied ever meeting the victim or being in his car. Defendant stated he did not "know what [Leyman was] talking about" and that he was going to "get [himself] a lawyer for whatever" Leyman was questioning him about. Leyman stopped questioning him about the murder, returned to the drugs, and the interview concluded shortly thereafter.

On March 14, 2018, a Cumberland County grand jury indicted defendant for (1) first-degree murder contrary to N.J.S.A. 2C:11-3(a)(1) and N.J.S.A. 2C:11-3(a)(2) (count one); (2) second-degree possession of a weapon for an unlawful purpose contrary to N.J.S.A. 2C:39-4(a)(1) (count two); (3) second-degree unlawful possession of a weapon contrary to N.J.S.A. 2C:39-5(b)(1) (count three); and (4) second-degree possession of a weapon by a convicted person contrary to N.J.S.A. 2C:39-7(b)(1) (count four) in relation to the murder of Miguel Lopez on January 15, 2017.

A-3528-21

Prior to trial, defendant moved to suppress his statement to Leyman and any evidence obtained from the seizure of his cell phone on February 22. The trial court denied defendant's motion and held the contents of his statement would be admissible, subject to any necessary redactions.

The State moved pre-trial to admit, among other things, testimony from Detective Anthony Calabrese (Calabrese) stating he was familiar with defendant, that defendant walked with a distinctive limp, and identifying defendant as the suspect depicted in the Spruce Street footage based on a review of the unrelated footage of defendant. The State also moved to admit previously recorded surveillance and police body worn camera/mobile video recorder footage depicting defendant, the testimony of Iacovone, and the motor vehicle summonses issued to defendant in Monroe Township on January 15, 2017.

The trial court denied the State's motion regarding Calabrese's testimony but granted the remaining portions of its motion. It determined Calabrese's opinion that the Spruce Street footage depicted defendant because of the similarities in the gait was impermissible lay opinion testimony and the issue was a question of fact within the jury's purview. The court specifically ruled Calabrese could not testify that he identified defendant from the Spruce Street footage but permitted the State to elicit testimony regarding how it came to

10

identify defendant as a suspect because of the distinctive limp. It was also allowed to illicit testimony regarding the motor vehicle summonses.

The State also moved pre-trial to qualify Leyman as an expert on historical cell site data, which was denied. The court stated: "[S]ome things make sense to anybody who reads them. When a call is made, . . . and what tower it hit on at a certain time, that's contained in here and any juror could understand that." Nevertheless, the court permitted Leyman "to provide only lay witness testimony regarding his review, interpretation, and plotting of the location of cell towers on a map from . . . defendant's historical cell site data records."

Although defendant's counsel continued to preserve its objection to the use of the testimony, the State and defendant's counsel agreed to the admission of the cell phone records and agreed to limit Leyman's testimony to "provid[ing] only lay witness testimony regarding his review, interpretation, and plotting of the location of cell towers on a map from the defendant's historical cell site data records." No testimony was permitted "concerning the azimuth of any antenna or any cell tower sector accessed by any call within the defendant's call detail records." The State was also prohibited from eliciting testimony "regarding the location of cell towers upon the termination of calls within the defendant's call detail records without further order from the [c]ourt." The court ordered "[o]nly

11

when the same cell tower was utilized for a cell phone call's origination and termination may the State provide evidence and testimony of the cell tower indicated at call termination within the defendant's call detail records."

At trial, Leyman testified extensively as to BPD's investigation into the victim's murder and the subsequent arrest of defendant. Leyman explained how he retraced the victim's path on the morning of the murder and how BPD used surveillance footage from various locations to determine the victim's course of travel. Leyman also explained BPD theorized defendant's involvement based on the Spruce Street footage's depiction of the suspect walking with a distinctive limp affecting his left leg. This led BPD to identify defendant as a suspect and inquire into his cell phone records. Leyman further determined that the site of defendant's car accident on Williamstown-Franklinville Road was directly between Cacia's Bakery and Parvins Mill Road, consistent with the victim's path southwest towards Bridgeton.

Leyman also testified as to the defendant's cell phone records. He compared the time and location of the towers to which defendant's cell phone connected with the victim's established course of travel from the surveillance footage. He also explained cell site data helped eliminate another potential suspect whose fingerprints were found in the victim's vehicle because that

suspect's cell phone connected to towers removed from the crime scene. Based on the records, between 7:30 a.m. and 8:30 a.m. on January 15, defendant's cell phone connected to cell towers progressively closer to Bridgeton as the victim travelled in that direction.

On cross-examination, Leyman confirmed, however, he did not know anything about the towers: he did not know their radii, the strength of reception, and could not account for any other variables that could explain why defendant's cell phone connected to those towers and not other nearby towers.

When Leyman began testifying, the court interjected to instruct the jury that although the State

> can show you those locations and how far apart they are[,] that evidence does not establish where that phone was at . . . that time that [the] call connected . . . . [J]ust because there is a cell tower somewhere proximate to something else doesn't mean that the phone was located [at] any particular spot within any particular distance from that tower . . . . So all you know is that a call connected at a certain time at that location and there was something else that happened somewhere around there. That doesn't mean that that phone was in any particular spot at the time that that phone call was made.

At the trial's conclusion, the court reiterated this instruction and added the jury needed to rely on additional evidence in connection with the historic cell site data to determine defendant's location. The court added, when evaluating the

13

information contained in the records, the jury "may not conclude . . . the cell phone changed position or moved in any particular location" when the phone switched from one tower to another.

After an eight-day trial, defendant was found guilty of each indicted offense on July 2, 2021. He was sentenced to forty-five years in prison, eighty-five percent of which was to be served without parole eligibility, for count one, which merged with count two. Defendant was also sentenced to ten years in prison with five years of parole ineligibility on count three, concurrent with the forty-five-year sentence for murder. This appeal followed.

## II.

We review evidentiary rulings made by the trial court for an abuse of discretion. State v. Allen, 254 N.J. 530, 543 (2023). We will not supplant the trial court's judgment with our own unless the trial court's "'ruling is "so wide of the mark" that it constitutes "a clear error in judgment."'" Ibid. (quoting State v. Garcia, 245 N.J. 412, 430 (2021)). The trial court's legal conclusions and its understanding of the consequences flowing from established facts, however, are subject to de novo review. State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

14

# III.

1.     Testimony regarding defendant's limp.

N.J.R.E. 701 permits a lay witness to testify in the form of an opinion or inference if the testimony "(a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." Allen, 254 N.J. at 543-44.  An "investigator who has carefully reviewed a video a sufficient number of times prior to trial can . . . satisfy the . . . 'perception' and 'personal knowledge' requirements as to what [a] video depicts." State v. Watson, 254 N.J. 558, 601 (2023).  Such a witness, however, "may not provide opinions or comment on reasonably disputed facts."  Allen, 254 N.J. at 546 (quoting Watson, 254 N.J. at 600-01).

Whether the Spruce Street footage depicted a suspect with a distinctive limp or someone stumbling as he fled the scene was a highly disputed factual issue at trial.  The trial court prohibited the State from admitting testimony identifying defendant as the person recorded in the Spruce Street footage. Leyman testified the video footage reviewed of the suspect demonstrated a gait similar to that of defendant, who was known to BPD, from unrelated video footage.

15

We do not discern any abuse of discretion. Testimony may be elicited to explain the role of the video in relation to the subsequent criminal investigation conducted by police. Allen, 254 N.J. at 548. BPD identified defendant as a potential suspect based on what it believed the Spruce Street footage depicted: a suspect with a distinctive limp to his left leg fleeing the crime scene. In line with this interpretation, BPD searched for individuals matching that description and eliminated a different suspect with a distinguishable limp.

Moreover, the trial court properly charged the jury as to the limited use of Leyman's testimony. At the conclusion of Leyman's testimony on that day of trial, the court instructed the jury that Leyman's testimony was limited to why BPD focused on defendant as a suspect. It explicitly stated the jury "may not use this testimony to conclude that the person in the prevailing footage is [defendant]. That is an independent question of fact you must decide for yourself."

That same instruction was given again at the trial's conclusion. The instructions' timing, specificity, and explanation comport with our caselaw. See State v. Herbert, 457 N.J. Super. 490, 505-07 (App. Div. 2019). We do not find Leyman's statements sufficient to make the possibility of injustice "real," or "raise a reasonable doubt as to whether the error led the jury to a result it

16

otherwise might not have reached." State v. Alessi, 240 N.J. 501, 527 (2020) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

2.    Cell Phone Testimony.

Recently, in State v. Burney, 255 N.J. 1 (2023), the Supreme Court addressed expert testimony and the use of historical cell site data analysis in the context of N.J.R.E. 702 and N.J.R.E. 703. Burney does not apply retroactively because it involves the application of the net opinion rule and does not set forth a new rule. See State v. Chirokovskcic, 373 N.J. Super. 125, 130 (App. Div. 2004) (If a decision does not announce a new rule of law, retroactivity is not at issue, the reason being new rules tend to "disrupt[] a practice long accepted and widely relied upon . . . and therefore have the potential to create confusion and disruption if applied retroactively." (alteration in original) (citation omitted)). Nevertheless, we find Burney's reasoning instructive and are guided by its rationale in our consideration of this issue.

In Burney, the FBI special agent, who was qualified as an expert, testified that based on his training and experience, a one-mile radius for a cell tower was a "good approximation regarding the coverage area." The Court concluded the "'rule of thumb' testimony constitute[d] an improper net opinion because it was unsupported by any factual evidence or other data." Id. at 25. The Court also

17

noted its prior rulings "that when an expert grounds testimony in personal views, rather than objective facts, the net opinion rule requires the exclusion of such unsupported views." Id. at 23. Significantly, the Court did not find analysis of historical cell site data inherently unreliable and expressly noted expert testimony need not necessarily "consider all of the factors" discussed in its summary of law and the agent's testimony. Id. at 25. Rather, "because the testimony was based on nothing more than . . . [the agent's] personal experience, the trial court erred in allowing the jury to hear [the] testimony." Ibid. The Court did not state whether expert testimony was necessary to address historical cell site data.

In the present matter, the State attempted to qualify Leyman as an expert, which the trial court denied. Nevertheless, Leyman was allowed to present essentially the same testimony regarding his review of defendant's historical cell site data and the cell site data of another potential suspect to demonstrate where each individual's phone may have been in relation to the victim on the night of the murder.

We conclude the trial court erred when it allowed lay testimony regarding the cell site data analysis. Having already ruled Leyman was not qualified as an expert, the court nevertheless allowed Leyman to testify as to the possible

locations of the cell phone at issue, a seminal issue in the case. Leyman was allowed to testify "regarding his review, interpretation, and plotting of the location of cell towers on a map from . . . defendant's historical cell site [data] records." If the records are as clear as the trial court stated, then Leyman's testimony does not aid the jury, Watson, 254 N.J. at 592 (quoting State v. Higgs, 253 N.J. 333, 363 (2023)), and his testimony comments on yet another reasonably disputed fact: whether defendant was in the victim's car at the time of the shooting, id. at 602. On at least two occasions, Leyman testified the location of certain cell towers was consistent with the victim's known location. In all but explicit words, Leyman opined, because defendant's cell phone connected to towers consistent with the general path of the victim's course of travel, defendant was in the car with the victim within an hour of the shooting. From the limited evidence proffered at trial, the strongest evidence placing defendant in the victim's car during the murder was Leyman's cell site data analysis of defendant's cell phone records.

Although the trial court provided limiting instructions on the use of the historic cell site data testimony, those instructions were insufficient to overcome the likely inference created by Leyman's testimony in this case of largely circumstantial evidence. No witness was able to identify defendant as the man

19

fleeing from Lopez's car, and no firearm was ever recovered. The only physical evidence linking defendant to the victim was his DNA on the cigar butt found in the victim's car. This is not a case where the admission of the historical cell site data testimony constitutes harmless error because of the other evidence adduced at trial. See Burney, 255 N.J. at 32 (Solomon, dissenting) ("the sheer volume of competent evidence against defendant . . . leads to the inescapable conclusion that defendant was convicted in a fair trial, and any error was harmless.")

3.    Defendant's Constitutional Arguments.

We find no merit to defendant's constitutional arguments and no reversible error. With respect to the alleged general warrant for his cell phone, defendant fails to identify what harm must be remedied for the alleged unconstitutional actions. "[T]he principal remedy for a violation of the constitutional right to be free from unreasonable searches and seizures is the exclusion of the evidence seized." State v. Shaw, 237 N.J. 588, 620 (2019) (quoting State v. Bryant, 227 N.J. 60, 71 (2016)). The record does not reveal any information from defendant's cell phone was admitted at trial. His cell phone records were obtained separately pursuant to a CDW before his cell phone was seized. Defendant's claim that we should reverse the denial of his motion to suppress

and vacate the convictions for "an evidentiary hearing . . . to assess the degree to which the phone records were tainted" does not follow. The cell phone records admitted at trial were obtained from defendant's cell phone provider prior to the seizure order, not as a result of the seizure of his phone.

Defendant's Miranda argument similarly fails to identify any reversible error. His reliance upon our decision in State v. Sims, 466 N.J. Super. 346 (App. Div. 2021), is unavailing. The Supreme Court has since reversed our decision, State v. Sims, 250 N.J. 189, 197 (2022), and "reaffirmed [the rule] that police are not required to advise an interrogee that he or she is a suspect of a particular crime when administering Miranda warnings," State v. Cotto, 471 N.J. Super. 489, 515 (App. Div. 2022). BPD read defendant his Miranda rights prior to questioning him, and defendant knowingly waived them.

Defendant's Confrontation Clause, sleeping juror, and N.J.R.E. 404(b) arguments do not warrant further discussion in this written opinion. R. 2:11-3(e). We reverse as to count one and count three of defendant's conviction, vacate the sentence, and remand to the trial court for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21